UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JERRY MCKINNEY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-01339-DDD-JPM |
| | ) | |
| RAPIDES PARISH SHERIFF'S OFFICE, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### <u>Memorandum in Support of Plaintiff's Motion for Summary Judgment</u>

Plaintiff Jerry McKinney, Sr. files this memorandum in support of his Motion for Summary Judgment.

This case is about Deputy McKinney, a twenty-year veteran of the Rapides Parish Sheriff's Office (RPSO), who suffered a stroke in late 2017. After his stroke, McKinney was able to return to work, but did not pass his firearm recertification. So RPSO moved him from the courthouse to the jail, and into a twelve-hour shift position that did not require firearm certification. Those twelve-hour shifts caused health problems for Deputy McKinney; his doctor recommended in a letter that his schedule be modified to eight-hour shifts.

Deputy McKinney gave that letter to his supervisor, Warden Batiste, and requested a reasonable accommodation of eight-hour shifts. That was no problem – Warden Batiste moved McKinney to an eight-hour job in the kitchen, testifying that "it's really not hard" to grant that accommodation. McKinney worked a few shifts there, and caused no complaints or burden.

But when RPSO higher-ups found out, things changed. RPSO ordered Deputy McKinney *back* to a twelve-hour position and told him that if he could not work twelve hours, he "should retire." When McKinney declined to retire and asked to be put in any eight-hour position anywhere

in the sheriff's office, RPSO fired him. They fired him five days before Christmas, after twenty years of service.

Why did RPSO fire him? RPSO says it fired Deputy McKinney because he worked two eight-hour shifts – even though it concedes that he did so with the explicit permission of his direct supervisor. RPSO also initially claimed it had to fire McKinney because it had no eight-hour jobs available. RPSO now, under oath, concedes that that explanation was false – there were multiple eight-hour jobs available, in addition to the one McKinney was already working in.

For RPSO to accommodate McKinney, all it had to do was nothing. It did not.

To its credit, RPSO did not even try to disguise the fact that fired McKinney for asking for an accommodation. On December 17, 2018, McKinney wrote a letter with the subject line "RE: Request for Accommodation by Deputy Jerry McKinney."[1] Two days later, the Sheriff responded with a letter, subject line "RE: Request for Alternative Arrangement." That letter fired McKinney.[2]

All of this violates the Americans With Disabilities Act and Rehabilitation Act. RPSO concedes that it never engaged in an interactive process of seeking accommodation with McKinney. And it concedes that it fired McKinney for asking for and using the brief accommodation the Warden granted to him. Accordingly, liability is established.

But in addition to knowing *that* the ADA was violated, it is helpful to understand *why* it was violated. As far as Plaintiff can tell, RPSO violated the ADA for two reasons.

Number one, Sheriff Hilton and his staff do not appear to have even the most basic understanding of their obligations under the ADA. For example, RPSO claims that in twenty-four years, it has never received anything that it understood to be a request for reasonable accommodation – *including* McKinney's letter that cited the ADA by name and said "this is a request for reasonable accommodation."

---

[1] Ex. J.
[2] Ex. K.

And number two, Sheriff Hilton testified as to his basic antipathy regarding the concept of providing reasonable accommodations to employees with disabilities. Here is Sheriff Hilton's testimony as to why Jerry McKinney couldn't continue working the approved eight-hour:

A.   It would have disrupted the operation of the department, and he would have created a situation where other employees probably would have felt like Jerry was getting special treatment, and you know, they just -- they don't like that, and they wouldn't have treated him like any other employee. Everybody has to be treated the same, and so that's how it is.

Q.   Regardless of whether they're fully able[d] or disabled, everyone has to be treated the same?

A.   Yes.

**Q.   Okay. So you're not going to make special accommodations for -- for someone with a disability? You want everyone to be treated the same?**

**A.   Yes.**[3]

Thus, Sheriff Hilton did not have a problem with McKinney's requested accommodation in particular. He had a problem with *the fundamental idea of accommodation for disability*. As he later testified: "any accommodation <u>at all</u> would have been an undue hardship."[4]

One more fact hammers home that this was discrimination on the basis of disability: RPSO concedes that it accommodated another employee with an eight-hour shift at the jail when they needed it for "family issues."[5] In sum:

An employee with "family issues" asks for eight-hour shifts? RPSO accommodated that.

But an employee with a disability asks for eight-hour shifts? RPSO fired that employee.


Summary judgment should issue for Plaintiff.

---

[3] Ex. A (30(b)(6) Deposition of Sheriff Hilton) at 109-110.
[4] *Id.* at 114 to 115. Emphasis added. This was echoed by Major Hollingsworth, who explained that McKinney should not be allowed the doctor-ordered 8-hour shifts because "the doctors don't run the Sheriff's Department." Ex. B at 47.
[5] Ex P at RFA 62-63 (admitting that employee was assigned to eight-hour shifts at the jail "due to a family issue.")

## Table of Contents

Pg.

Introduction ........................................................................................ 1

Table of Contents ............................................................................... 4

Table of Authorities .......................................................................... 5

**I.    Statement of Facts** ..................................................................... 6

    A.    The Rapides Parish Sheriff's Office does not understand its obligations under the ADA/RA or attempt to comply with them. ................................... 6

    B.    The Rapides Parish Sheriff's Office understood that Jerry McKinney was a person with a disability, received his doctor's recommendation for eight-hour shifts, and then fired him instead of accommodating him. ................. 9

**II.   Analysis** ..................................................................................... 15

    A.    The Americans With Disabilities Act and Rehabilitation Act require an interactive process of seeking accommodation, forbid the failure to provide employees with reasonable accommodations, and make retaliation illegal. ... 15

    B.    Deputy McKinney was a qualified individual under the ADA. ................. 15

    C.    Jerry McKinney requested a reasonable accommodation of eight-hour shifts. .. 17

    D.    The motion should be granted because RPSO violated the ADA/RA by failing to engage in an interactive process of seeking accommodation with Deputy McKinney. ................................................................. 20

    E.    The motion should be granted because RPSO violated the ADA/RA by taking a reasonable accommodation *away* from Deputy McKinney because they did not want him to get "special treatment." ................................. 22

    F.    The motion should be granted for ADA/RA retaliation because RPSO admits it fired Deputy McKinney for asking for and working the eight-hour shifts allowed by his supervisor, Warden Batiste. ................................. 26

    G.    Nothing has changed. If another deputy made the same requests for accommodation as Jerry McKinney, she would be treated the same way. ..... 29

**III.  Conclusion** ................................................................................. 30

## Table of Authorities

### Cases

*Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996)     21

*EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009)     20

*Hacker v. Cain*, 2016 WL 3167176 (M.D. La. June 6, 2016)     21

*Jenkins v. Cleco Power*, LLC, 487 F. 3d 309 (5th Cir. 2007)     21

*Mora v. Univ. of Texas SW Med. Ctr.,* No. 11-10279 at *5 (5th Cir. 2012)     27, 28

*Molina v. D.S.I. Renal, Inc.*, 11-cv-00028, R. Doc. 17 (W.D. Tex., May 24, 2012)   17

*Rodriguez Diaz v. Big K-Mart,* 582 F.Supp.2d 147 (D.P.R. 2008)     17

*Rorrer v. City of Stow*, 743 F.3d 1025 (6th Cir. 2014)     21

*Stokes v. Nielsen*, 751 Fed.Appx. 451 (5th Cir. Oct. 8, 2018)     20

*Swanson v. Village of Flossmoor*, 794 F.3d 820 (7th Cir. 2015)     17

*Vinson v. Thomas*, 288 F.3d 1145, 1152 (9th Cir. 2002)     15

*Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999)     15

### Statutes

ADA Amendments Act of 2008, PL 110-325, § 2(b)(5)     17

42 U.S.C. § 12102(1)     16

42 U.S.C. § 12102(2)(A)     17

42 U.S.C. § 12203(a)     15, 26

42 U.S.C. § 12111(9)     17

42 U.S.C. § 12112(b)(5)(A)     15, 22

### Code of Federal Regulations

28 C.F.R. § 35.134     15, 26

29 C.F.R. § 35.107 (a)     6

29 C.F.R. § 35.107 (b)     6

29 C.F.R. § 1630.2(g)     16

29 C.F.R. § 1630.2(j)(1)(iv)     17

29 C.F.R. § 1630.2(o)(2)     17

29 C.F.R. § 1630.2(o)(3)     15, 20

29 C.F.R. § 1630.9     15, 22

### Other Authorities

*[Redacted] v. Wilkie*, Appeal No. 0120171549 (EEOC Fed. Sect. Dec., May 17, 2019)   26

*Earl v. Potter*, Appeal No. 01994514 (EEOC Fed. Sect. Dec., May 21, 2002)     26

U.S. Equal Employment Opportunity Commission, *Employer-Provided Leave and the Americans with Disabilities Act*, EEOC-NVTA-2016-1 (May 9, 2016)     26

U.S. Department of Labor, Office of Disability Employment Policy, *Accommodations*[6]     25

---

[6] Available online at https://www.dol.gov/agencies/odep/topics/accommodations .

# I.   STATEMENT OF FACTS

**A.    The Rapides Parish Sheriff's Office does not understand its obligations under the ADA/RA or attempt to comply with them.**

The Rapides Parish Sheriff's Office is a public entity that employs approximately 600 people.[7] Despite its size, it does not comply with even the most basic federally-mandated requirements of the Americans With Disabilities Act or Rehabilitation Act ("ADA/RA").

For example, the ADA's implementing regulations require that any "public entity that employs 50 or more persons shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities."[8] RPSO does not, however, have an ADA coordinator or any person designated to coordinate its ADA responsibilities.[9] Similarly, ADA regulations also require that any "public entity that employs 50 or more persons shall adopt and publish grievance procedures" for ADA complaints.[10] But RPSO has not adopted or published "any grievance procedures related to ADA issues."[11]

RPSO conducts no in-office formal training on the ADA.[12] RPSO does have a written ADA/RA policy, but it is three sentences long and provides no detail.[13] By contrast, the RPSO "Personal Appearance" policy is *eighty-three* sentences long, and details the buttoning of buttons, whether deputies may wear necklaces, and specifies that the "thickness of the hair on the side above the ear . . . shall not exceed ½ inch."[14]

---

[7] Ex. A (30(b)(6) Deposition of RPSO) at 40 ("We have 600 employees.")
[8] 29 C.F.R. § 35.107 (a).
[9] Ex. A at 36 ("Q. Okay. Does the Sheriff's Office have an ADA coordinator? A. No. . . . Q. Okay. So it's fair to say the Sheriff's Office does not have a particular person who's designated to coordinate efforts to comply with the ADA? A. That's correct, yes."_
[10] 29 C.F.R. § 35.107 (b).
[11] Ex. A at 36-37. ("Q. Okay. Has the Sheriff's Office adopted and published any grievance procedures related to ADA issues? A. Not to my knowledge.")
[12] Ex. N at Response to RFP No. 40 ("the Sheriff does not have in-office formal training on the ADA."); Ex. T at ("Q. Do you recall ever attending any ADA training at the Rapides Parish Sheriff's Office? A. I can't recall any.")
[13] Ex. C (RPSO Manual) at 36.
[14] *Id.* at 19-24.

RPSO was led by Sheriff Hilton for 24 years. He contends that "no one has ever asked for accommodation for ADA in all my years here."[15] Nor was Sheriff Hilton aware that RPSO had an ADA policy.[16] But he testified that if RPSO did receive a request for accommodation, it "would be investigated through Internal Affairs," rather than through Human Resources.[17] (Internal Affairs is the department that "investigates complaints about deputies or misconduct by deputies."[18]) Sheriff Hilton described an employee asking for a reasonable accommodation as a "**complainer** asking for a different job other than what he was assigned to."[19] Although he concedes RPSO has had employees with disabilities, he testified that  never once did RPSO engage in an "interactive process of determining whether they needed accommodations."[20]

How could an employer of approximately 600 people possibly claim it has never received a request for accommodation? First, RPSO does not have a form that that deputies can fill out to request an accommodation.[21] And RPSO takes the position that if an employee turns in "a doctor's note that describes recommended restrictions on a deputy's work, if it doesn't say, 'request for accommodation,' it's not understood by the Sheriff's Office to be a request for accommodation."[22] But the reality is even worse: Jerry McKinney submitted a letter saying "as a person with a disability under the Americans with Disabilities Act, I am requesting reasonable accommodation,"[23] and even *that* was not understood to be a request for accommodation.[24]

---

[15] Ex. A at 49. *See also* Ex. M at RFA 49-50 (admitting that "Neither Sheriff Hilton nor the RPSO has received any request . . .  which was contemporaneously understood as a request for accommodation under the ADA" in the last fifteen years); Ex. M at 51 (admitting that during his twenty-four year tenure, "Sheriff Hilton has never received any request . . .  which was contemporaneously understood as a request for accommodation under the ADA.")

[16] *Id.* at 38-40 ("Q. Okay. Does the Sheriff's Office have any policies related to the ADA? A. I can't answer that. I don't know.")

[17] *Id.* at 39.

[18] *Id*. at 39-40.

[19] *Id.* at 40 (emphasis added).

[20] *Id.* at 46.

[21] *Id.* at 42: ("Q. Okay. Does the Sheriff's office have a form that deputies can fill out to request an accommodation under the ADA? A. No.")

[22] *Id.* at 41.

[23] *Id.* at 67.

[24] Sheriff Hilton has testified both that he *did* and *did not* understand McKinney to be making a request for accommodation at the time Hilton received his letters. He repeatedly changed his testimony between these positions.

To summarize: RPSO

- Does not have an ADA coordinator;

- Does not conduct any ADA training;

- Does not have an ADA grievance process;

- Does not have a form for requesting accommodations;

- Does not recognize doctor's notes as requests for accommodation;

- Does not engage in an interactive process of seeking accommodation;

- Identifies requesters as "complainers"; and

- Would route any requests for accommodation through the Internal Affairs department – if it ever received one.

It therefore is not surprising that in Sheriff Hilton's twenty-four years as sheriff, RPSO never, ever provided an accommodation to an employee with a disability:

```
Q.   Okay.  So the Sheriff's Office during your
     tenure has never provided an accommodation
     for a disability to an employee.  Is that
     correct?

A.   Correct.                                    [25]
```

---

First, Sheriff Hilton testified that at the time, he did not understand Deputy McKinney to be making a request for accommodation. Ex. A at 49-50 ("Q. Okay. So at the time, you did not consider Jerry McKinney to be an ADA issue. Is that correct? A. That's correct. . . . I did not take it as a request for an ADA consideration."); *id*. at 67 ("Q. Yeah, and so you testified earlier that you -- you didn't understand Mr. McKinney at the time to be making a request for reasonable accommodation, right? A. Yes.  Q. But you read this letter, correct? A. Yes.")

Later, Sheriff McKinney flipped, testifying that at the time, he *did* understand it to be a request for accommodation. *Id*. at 71 ("Q. . Okay. So you're saying that at the time you understood Mr. McKinney's letter to be a request for accommodation under the Americans With Disabilities Act; yes? A. I can answer that yes.")

Still later, he flipped back.  *Id*. at 75 ("Q. Okay. So that gets me back to now that we've established that at the time you did not understand Mr. McKinney's letters to be a request for reasonable accommodation under the ADA, right? A. Yes.")

Then, one page later, he flipped back again. *Id*. at 76 ("Our line of transferring Jerry McKinney to DC-3 was complying with his request for Americans with Disabilities Act.").

[25] Ex. A at 46.

Similarly, with regard to members of the public, Sheriff Hilton testified that "The courthouse is accessible to people -- for people with disabilities, and that's as far as we go. We haven't made any special accommodations to accommodate anybody with a disability."[26] RPSO provides no training or policies for its deputies interacting with persons with disabilities.[27]

This is the backdrop against which Jerry McKinney's request for accommodation was received.

**B.    The Rapides Parish Sheriff's Office understood that Jerry McKinney was a person with a disability, received his doctor's recommendation for eight-hour shifts, and then fired him instead of accommodating him.**

Jerry McKinney began his career as a Ranger in the United States Army. He served in the infantry, military police, and in an administrative capacity as a Personnel Specialist.

In 1998, after returning to civilian life, Deputy McKinney was hired by RPSO as a Correctional Officer.[28] In 2009, he was he was transferred from Corrections to Courtroom Security.[29]

According to the RPSO's 30(b)(6) witness, Mr. McKinney "had a clean record, no problems."[30] He "was hard working, reliable, people liked him."[31] According to his direct supervisor, Warden Batiste, Jerry McKinney "was always at work way before it was time for work to start. He always did his job beyond call of duty. . . He was an outstanding worker. Everybody knew it."[32] Even Sheriff Hilton could not "say anything negative about his work abilities and his

---

[26] Ex. A (30(b)(6) Dep.) at 48.
[27] *Id.* at 48.
[28] *Id.* at 55.
[29] *Id.* at 56.
[30] *Id.* at 61 ("Q. Yeah. So for the last more than decade of his -- of his career with the Sheriff's Office, he had a clean record, no problems, correct? A. Yes.")
[31] *Id.* at 61 ("Q. He was hard working, reliable, people liked him?  A. Very personable. Yes, he was good, yes.")
[32] Ex. B (Dep. of Warden Batiste) at 23-25.

work performance."[33] According to Sheriff Hilton and Major Hollingsworth, McKinney "served [RPSO] and this community well for over 20 years."[34]

In November 2017, Deputy McKinney had a stroke.[35] He went on medical leave through February 2018,[36] and then returned to work at the courthouse. Even after his stroke he was "still reliable and hard working."[37] But the stroke left Mr. McKinney with physical and mental impairments. According to a RPSO report, Deputy McKinney "was having difficulty with simple motor skills such as walking, balance, comprehension, and also appeared to be generally fatigued. . . . His speech was slurred, and he was stuttering."[38]  As a result, in the fall of 2018, Deputy McKinney failed his firearm recertification process. According to RPSO, that was "[b]ecause he was impaired from the stroke he had had the year before."[39]

This caused McKinney to lose his POST certification. But according to RPSO, generally, "losing POST certification is not a reason to terminate an employee."[40] And so on November 12, 2018, Deputy McKinney was transferred to the jail[41] because "in Corrections it's not required that the deputy be firearm certified and carry a gun."[42]

At that time, Warden Antoine Batiste was in charge of the jail facility Deputy McKinney was transferred to.[43] Batiste was the "Chief Executive Officer"[44] of the jail, and so was responsible

---

[33] Ex. A at 62 ("I can't say anything negative about his work abilities and his work performance.")
[34] Ex. I (Letter from Sheriff Hilton); Ex. T (Dep. of Major Hollingsworth) at 67.
[35] Ex. A at 56-57.
[36] Ex. A at 57.
[37] Ex. B at 25-26.
[38] Ex. D.
[39] Ex. A at 57
[40] Ex. A at 196. ("Q. So generally losing POST certification is not a reason to terminate an employee, correct? A. No.")
[41] Ex. F (Transfer Memorandum)
[42] Ex. A at 58.
[43] Ex. A at 59.
[44] Ex. U at 4 (Organization Chart for RPSO Corrections)

for "formulat[ing] necessary policies and procedures"[45] and being "responsible for the day-to-day management of that facility."[46] Batiste was "[r]esponsible for all phases of operation" at the jail.[47]

At the jail, most deputies worked twelve-hour shifts. Twelve-hour shifts are not "something inherent to the job" or "integral to the nature of corrections."[48] It is "for the convenience and benefit of the employees."[49] Some other jobs at the jail work on eight-hour shifts, such as three jobs in the kitchen and about six to eight jobs in the administrative office.[50] Outside of the jail, there are also "a couple hundred jobs at the Sheriff's Office that do not require [firearm] certification and are eight-hour shifts."[51]

The twelve-hour shifts were too long for McKinney, given his medical issues. In a letter of November 28, 2018, his doctor recommended that McKinney "is to work 8 hours a day because I do not want his stress level to go up and cause elevated blood pressure with repeat stroke, especially a hemorrhagic stroke."[52]

Jerry McKinney gave the doctor's letter to his supervisor, Warden Batiste.[53] Warden Batiste understood that the "letter was requesting accommodation for Jerry because of a disability."[54] Accordingly, Warden Batiste assigned Mr. McKinney to work in the jail's kitchen, a

---

[45] *Id.*
[46] Ex. A at 59.
[47] Ex. U at 4 (Organization Chart for RPSO Corrections)
[48] Ex. A at 60.
[49] Ex. A at 60.
[50] Ex. B (Batiste Dep.) at 19-20, 38-39. Ex S (Dep. of Jacqueline Mitchell, current RPSO employee) at 27 ("Q. Okay. So do you know if they have eight-hour shift positions in DC-2 or DC-3 for corrections officers? A. In the kitchen, yes, they do."); See also Ex. T at 136 ("Q. So there's at least nine or ten either positions or departments [in corrections] that employ 8-hour employees, correct? A. Yes.")
[51] Ex. A at 159.
[52] Ex. E (November 27, 2018 Doctor's Letter).
[53] Ex. B at 32.
[54] Ex. B at 33 ("Q. Okay, and so when you read this letter, is it fair to say that you understood that this letter was requesting accommodation for Jerry because of a disability? A. Yes.")

position that only required eight-hour shifts.[55] He made that assignment as an accommodation for Mr. McKinney's disability.[56]

McKinney worked approximately two eight-hour shifts in the kitchen.[57] This caused no problems – Warden Batiste testified that there were no complaints about McKinney's performance and no complaints from other employees.[58] Warden Batiste said he had no "problems at all as the Warden with Jerry McKinney doing the eight-hour shift in the kitchen."[59]

But then the RPSO higher-ups found out about McKinney being accommodated.[60]

At 10:12 a.m. on November 29, 2018, Major Hollingsworth first reviewed McKinney's doctor's letter. [61] At 10:28 a.m, Hollingsworth forwarded the letter to Deputy Chief Debbie McBeth and conferred with her about it.[62] At 10:49 a.m. Hollingsworth sent a signed letter responding to McKinney's request.[63] That letter stated that eight-hour shifts are "not in [McKinney's] job description" and advised that his "job description is working a 12 hour shift with offenders and if you cannot do this, **my suggestion is to retire**."[64]

---

[55] Ex. B at 33 ("Q. Okay, and so based on receiving this doctor's letter from Jerry, is that why you assigned him to work for Lou Howard in the kitchen? A. Yes.")

[56] Ex. B at 33-34 ("Q. Okay, and you approved that accommodation as the Warden of the jail, correct? A. That's correct. Q. Okay.")

[57] Ex. A at 142.

[58] Ex. B at 42.

[59] Ex. B at 42.

[60] Ex. B at 28 ("Hollingsworth and Commander Saucier saw him in the front office in the administrative office and asked him what he was doing, and he told them that he was assigned to the kitchen.")

[61] Ex. T (Dep. of Major Hollingsworth) at 38.

[62] Ex. T at 40.

[63] Ex. T at 40.

[64] Ex. G. Emphasis added.

In response to the letter by Dr. Hajmurad stating you can only work 8 hours a day in an administrative setting is not your job description. Your job description is working a 12 hour shift with offenders and if you cannot do this, my suggestion is to retire.

Sincerely,

Major Douglas Hollingsworth

**Figure 1**, Excerpt of Major Hollingsworth Response Letter

(According to Warden Batiste, RPSO sends these "we suggest you resign" letters when "the Sheriff's Office basically wants the person gone."[65])

Thus, there were only twenty-one minutes during which Major Hollingsworth and Deputy Chief McBeth conferred and formulated a response to McKinney.  Major Hollingsworth testified that he spent fourteen or fifteen of the twenty-one minutes "reading the letter and preparing a response."[66] That left only *five or six minutes* in which Hollingsworth might have been "talking to the administration to try and see if there were any openings or, you know, if there was anywhere that Mr. McKinney could be placed."[67]

On December 5, 2018, Deputy McKinney responded with a letter explaining that as "a person with a disability under the Americans With Disabilities Act (ADA). I am requesting reasonable accommodation to allow me to perform my job duties. . .  I would like to change my location and work schedule so that I can work eight (8) hours per day and not the twelve (12) I am currently assigned."[68] He attached a copy of the doctor's letter recommending eight hours.

---

[65] Ex. B at 64.
[66] Ex. T at 43.
[67] See Ex. T (Q. So what you were doing in that five or six minutes is talking to the administration to try and see if there were any openings or, you know, if there was anywhere that Mr. McKinney could be placed; is that right? A. Yeah. I tell you that I don't remember anything.")
[68] Ex. H (Dec. 5, 2018 Letter from McKinney).

13

On December 10, 2018, Sheriff Hilton sent a letter to Deputy McKinney in response to his request for an alternative job assignment. Sheriff Hilton claimed there were no other positions available, and reiterated that "we feel it is time for you to retire."[69]

> You have served this department and this community well for over 20 years, and although we are very sympathetic to you situations, there are no other positions available in the department for which you are qualified, and we feel it is time for you to retire.
>
> Sincerely,
>
> *[signature]*
>
> William E. Hilton
> Sheriff

**Figure 2**, Excerpt of Sheriff Hilton's Response Letter

On December 17, 2018, McKinney responded, clarifying that he was asking to "work in any other section of the sheriff's office which may have eight hour shift." He concluded that "I do not want to retire at this time and feel that I can continue my career at the sheriff's office very successfully."[70]

Two days later, on December 19, 2018, Sheriff Hilton responded by firing McKinney "effective immediately."[71] The termination was explicitly a response to Deputy McKinney's request for reasonable accommodation, as indicated by the subject line of the Sheriff's letter: "RE: Request for Alternative Arrangement."[72]

After two decades of service and loyalty to Rapides Parish, Deputy McKinney was fired five days before Christmas. This hurt Deputy McKinney deeply.[73]

---

[69] Ex. I (Dec. 10, 2018 Letter from Hilton).
[70] Ex. J (Dec. 17, 2018 Letter from McKinney).
[71] Ex. K (Dec. 19, 2018 Termination Letter).
[72] Ex. K (Dec. 19, 2018 Termination Letter).
[73] Ex. B (Dep. of Warden Batiste) ("Kind of like I said, he teared up, kind of shook his head, and you could tell that he was hurt because he was dedicated to his job at the Sheriff's Department, whatever assignment they gave him. He -- he was dedicated to do it, and he thanked me for the things that I had done for him on his way out the door. He was very, very upset.")

On October 11, 2019, Deputy McKinney filed this lawsuit, alleging violations of the Americans With Disabilities Act, the Rehabilitation Act, the Louisiana Employment Discrimination Law, and Breach of the Implied Covenant of Good Faith and Fair Dealing.[74]

## II.    ANALYSIS

**A.    The Americans With Disabilities Act and Rehabilitation Act require an interactive process of seeking accommodation, forbid the failure to provide employees with reasonable accommodations, and make retaliation illegal.**

The Americans With Disabilities Act makes discrimination on the basis of disability illegal. Such discrimination is defined to include a failure to make a reasonable accommodation for an employee with a disability.[75] In order to achieve such accommodations, the ADA obligates an employer to engage in an interactive process with an employee to identify limitations and generate potential solutions.[76] And to protect employees who engage in this process, the ADA prohibits retaliation and interference for seeking or using reasonable accommodations.[77]

The Rehabilitation Act ("RA") similarly protects qualified individuals from discrimination on the basis of disability by entities receiving financial assistance from the federal government. 29 U.S.C. § 794 *et seq.* The same prima facie case can be made by a disabled plaintiff under both acts,[78] and courts often analyze the two statutes together "because there is no significant difference in the analysis of rights and obligations created by the two Acts."[79]

**B.    Deputy McKinney was a qualified individual under the ADA/RA.**

Under the ADA/RA, a person may be a qualified individual with a disability by meeting any one of three different tests: (1) having a "record of" the disability; (2) being "regarded as"

---

[74] R. Doc. 1 (Complaint).
[75] 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.
[76] 29 C.F.R. § 1630.2(o)(3).
[77] 42 U.S.C. § 12203(a); 28 U.S.C § 35.134 (Retaliation & Coercion).
[78] *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999).
[79] *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

having a disability; or (3) or having an "impairment that substantially limits one or more major life activities."[80] Here, Deputy McKinney meets all three tests, although he need only meet one.

First, Defendants concede they had a "record of" Deputy McKinney's disability. Specifically, a RPSO employee wrote a report detailing his observations that Deputy McKinney "was having difficulty with simple motor skills such as walking, balance, comprehension, and also appeared to be generally fatigued. . . . His speech was slurred, and he was stuttering."[81] RPSO's 30(b)(6) witness reviewed that report and testified that:

```
Q.   That describes a person with a disability,
     correct?
A.   That's correct.
Q.   Okay, and so this is a record of a person
     with a disability, correct?
A.   Yes.
```
[82]

Second, RPSO "regarded" McKinney as a person with a disability. The standard for this test is lower than the others. For "regarded-as" protections under the ADA, no "disability" is required – only the much-easier-to-establish "impairment." 42 US.C. § 12102(1)(C); (3)(A) (regarded-as protections apply "whether or not the impairment limits or is perceived to limit a major life activity.") Here, RPSO concedes that McKinney was impaired; its 30(b)(6) witness testified that "he was impaired from the stroke he had had the year before."[83] They also regarded him as so impaired that they repeatedly told him "we feel it is time for you to retire."[84]

Third, McKinney also meets the test of being a person with an "impairment that substantially limits one or more major life activities." After 2008, the threshold for finding such

---

[80] 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).
[81] Ex. D (May 7, 2019 Incident Report).
[82] Ex. A at 53-54.
[83] Ex. A at 57.
[84] Ex. G (Nov. 29, 2018 Letter from Hollingsworth); Ex. I (Dec. 10, 2018 Letter from Sheriff Hilton).

an impairment is very low. That year, Congress passed the ADA Amendments Act of 2008, which established that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."[85] Here, McKinney's doctor assessed that he had "multiple neurological and medical conditions"[86] and was sufficiently impaired as to restrict the hours of his working, and to avoid loud noises.[87] McKinney's impairment caused him obvious difficulty with walking, speaking, and communicating,[88] all of which are "major life activities" explicitly included in the text of the ADA.[89]

Because he meets all three tests, McKinney is a qualified person with a disability under the ADA/RA.

**C.     Jerry McKinney requested a reasonable accommodation of eight-hour shifts.**

The ADA/RA defines "reasonable accommodation" to explicitly include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position."[90]

As described above, after Jerry failed the firearm recertification due to the effects of his stroke, RPSO moved him from the courthouse to the jail.

At the jail, Jerry was put in a job with twelve-hour shifts. The twelve-hour shifts were not "something inherent to the job" or "integral to the nature of corrections," according to RPSO's

---

[85] ADA Amendments Act of 2008, PL 110-325, § 2(b)(5) (emphasis added). For this reason, case law pre-dating the ADA Amendments Act of 2008 (ADAAA) generally should not be relied upon in determining impairment, because the 2008 amendments were enacted to lower the standard of functional limitation necessary to show that a person is impaired. *Molina v. D.S.I. Renal, Inc.*, 11-cv-00028, R. Doc. 17. (W.D. Tex., May 24, 2012), *citing* 29 CFR § 1630.2(j)(1)(iv).

[86] Ex. O (July 31, 2018 Letter of Dr. M. Riad Hajumurad) (noting that as of July 2018, he "has not been able to function on full active condition.")

[87] Ex. E (Nov. 27, 2018 Letter of Dr. M. Riad Hajumurad).

[88] Ex. D (May 7, 2019 Incident Report).

[89] 42 U.S.C. 12102(2)(A). *Cf. Swanson v. Village of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015) (finding that an officer who, after suffering a stroke, was required by a doctor to work part-time as requiring this reasonable accommodation under the ADA). *See also Rodriguez Diaz v. Big K-Mart*, 582 F.Supp.2d 147, 153 (D.P.R. 2008) (finding complaint sufficiently alleged disability discrimination under the ADA, where plaintiff's disability allegation was that she suffered post-stroke impairments that substantially limited major life activities by causing increased pain and longer time to complete tasks than the average person).

[90] 42 U.S.C. 12111(9); 29 C.F.R. § 1630.2(o)(2).

30(b)(6) witness.[91] They are "for the convenience and benefit of the employees,"[92] because it "gives the employee a little time off. It's a lot of hours on the front end, but he gets a lot of time off on the back end, and employees like that."[93]

The shifts were not a benefit for Jerry, however. Due to his disability, the long shifts exacerbated some of his health issues, including his blood pressure. So his doctor recommended his schedule be modified to allow eight-hour shifts.

In his letters of December 5 and 17, 2020, Jerry McKinney requested to be put in a position with eight-hour shifts. This was a reasonable request, as RPSO had in the past been "able to accommodate eight-hour shifts for people who needed that for family reasons."[94] At least one staff member was accommodated with an eight-hour shift in the jail's kitchen to accommodate the need to care for a sick parent,[95] and another was accommodated with an eight-hour shift in the jail

---

[91] Ex. A at 60:

> Q. Okay. So it's not something inherent to the job, like, I don't know, like, you have to get flown somewhere, and the flights only go every 12 hours or something. It's -- it's for administrative convenience and the benefit of the employee, but it's not something integral to the nature of corrections. Is that correct?
> MR. RICHARDSON: Object to the form.
> Q. What was your answer, Sheriff?
> A. Yes.

[92] Ex. A at 60.
[93] *Id.* at 59. Sheriff Hilton testified that although the twelve-hour shifts were not integral to the work, he would not modify them because "It's like being in the military. It's a ritual. You do everything on time. You do it exactly the same every day, and we couldn't make an . . . exception for Jerry." Ex. at 108.

But this is exactly the kind of rigidity that the ADA forbids: "The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or alleviated. These barriers may be . . . **rigid work schedules** that permit no flexibility as to when work is performed or when breaks may be taken." 29 C.F.R., Appendix to Part 1630. Interpretive Guidance on Title I of the Americans With Disabilities Act. (Emphasis added.)

[94] Ex. B (Dep. of Warden Batiste) at 36.
[95] *Id.* at 34-35 (Bobbie Duncan was accommodated with an eight-hour shift at the jail for more than a year); Ex. P at Response to RFA 62 (Admitting that "Bobbie Duncan was assigned to eight-hour shifts due to a family issue."); Ex. S at 20-21 ("She stayed in the jail, but they allowed her to work eight hours.")

kitchen for an injury.[96] There had even been another deputy with a stroke who "got an eight-hour shift to work."[97]

After receiving Jerry McKinney's request for eight-hour shifts, Warden Batiste approved him to work eight-hour shifts in the jail's kitchen. This did not require creating a new position, because there was already available work for him in the kitchen.[98]

McKinney worked a few of these shifts, and Batiste testified that it did not cause any problems at the jail:

> Q.   And did you get any kind of complaints
>      about Jerry's performance on the job?
> A.   No.
> Q.   Did you get any complaints from other
>      employees that they felt it was unfair that
>      Jerry had an eight-hour shift?
> A.   No.
> Q.   Okay.  Did you have any problems at all as
>      the Warden with Jerry McKinney doing the
>      eight-hour shift in the kitchen?
> A.   No.
> Q.   And would you have continued to allow him
>      to work those eight-hour shifts if the
>      Sheriff hadn't told you not to?
> A.   Yes.[99]

As a result, we do not have to speculate about whether a plaintiff's requested accommodation would have been reasonable. Here, it was implemented for a short time, and

---

[96] Ex. B at 40; *see* Ex. P at RFA 59-60 (admitting that Lou Howard was assigned to eight hour shifts in the jail kitchen, but denying it was an accommodation).

[97] Ex. S (Deposition of current RPSO employee Jacqueline Mitchell) at 19-20.

[98] Ex. B (Dep. of Warden Batiste) at 46-47 ("Q. Okay, and you would agree with me that they didn't have to make a position for Jerry because the folks working in the kitchen already did work eight-hour shifts. Is that fair to say? A. Yes. Q. Okay, and that's the position that you gave Jerry? A. Yes.")

[99] *Id.* at 42.

caused no problems or undue burden. Warden Batiste testified that it was "really not hard to do."[100] We know based on actual observation that the requested accommodation was reasonable.

Even if Jerry McKinney could not have continued working in that jail kitchen position for some reason, RPSO had a range of other eight-hour-shift jobs that similarly did not require firearm certification. RPSO testified that "several hundred" of the RPSO's six hundred jobs met that criteria,[101] and RPSO records show that at least several of them were open and unfilled in December 2018.[102]

Thus, because McKinney was asking for an accommodation explicitly included in the text of the ADA – a "part-time or modified work schedule" – and because observation shows that it caused no problems or undue burden, it is established that he was requesting a reasonable accommodation.

**D.  The motion should be granted because RPSO violated the ADA/RA by failing to engage in an interactive process of seeking accommodation with Deputy McKinney.**

Under the ADA/RA, an employer is obligated to engage in an interactive process with the employee that identifies the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.[103] This interactive process is mandatory.[104] And if the plaintiff makes a *prima facie* showing that he proposed a reasonable

---

[100] Ex. B at 61.

[101] Ex. A at 159 (There are approximately "a couple hundred jobs at the Sheriff's Office that do not require [firearm] certification and are eight-hour shifts.")

[102] *Id.* at 168 to 187 (detailing an opening for an accountant in the finance department, a part-time assistant role in the finance department, a jail records position, a road crew relief driver position, and a booking officer position) RPSO conceded that "there were at least some positions that Jerry could have been qualified for," but was not offered. Ex. A at 185. RPSO conceded that their prior explanation – that "there were no vacant positions" – was "not true." Ex. A at 186 to 187. See also Ex. T at 110 (jail records position opened in November 2018, not filled until Dec. 6, 2018).

[103] 29 C.F.R. § 1630.2(o)(3).

[104] *Stokes v. Nielsen*, 751 Fed.Appx. 451, 455 (5th Cir. Oct. 8, 2018). *See also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (finding that once an employee's need for accommodation under the ADA is "known" to the employer, it then is obligated to commence an "interactive process" – a "meaningful dialogue with the employee to find the best means of accommodating that disability.")

accommodation, the failure to engage in an interactive process of seeking accommodation is itself an independent violation of federal law.[105]

Here, the first element of a no-interactive-process claim is met because Jerry McKinney has made a *prima facie* showing of a reasonable accommodation. As described in the previous section, his request for eight-hour shifts was (1) an accommodation Warden Batiste implemented without trouble or burden; (2) something RPSO had provided to other jail employees; (3) not in conflict with the "integral nature" of jail work, and (4) something that could have been accommodated by moving him to one of the open eight-hour shift jobs in other departments.

The second element of a no-interactive-process claim is met because RPSO agrees it never engaged in an interactive process of seeking accommodation with McKinney.

```
Q.  Did you have any communication with him
    about what he could or couldn't do and what
    jobs he might be suited for and might not
    be suited for?
A.  No.
Q.  So you didn't have an interactive process
    with him of -- of seeing what kind of jobs
    he could do or what kind of accommodations
    he needed.  Is that correct?
A.  That's correct.
```
[106]

---

[105] *Hacker v. Cain,* 14-cv-00063 at *25-26, 2016 U.S. Dist. LEXIS 73014, 2016 WL 3167176 (M.D. La. June 6, 2016) (failure to engage in interactive process is "an independent violation of the ADA" if "the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation."), *citing Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014). *See also Jenkins v. Cleco Power, LLC*, 487 F. 3d 309 (5th Cir. 2007) ("When an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA."), *citing Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) (failure to communicate indicates bad faith).

[106] Ex. A at 99. *See also* Ex T (Dep. of Major Hollingsworth) at 53 ("Q. So you definitely didn't talk to him when you got the November 27th letter to talk about possible ways that his request could be accommodated, right? A. No. That doesn't fall under -- that would be strictly the Sheriff."); *id.* at 56 ("Q. So when you received the letter from Mr. McKinney from his doctor on November 29th knowing that what he was asking could only be approved by the Sheriff, did you talk to the Sheriff about the letter or any possible accommodations? A. No.")

That failure to engage was not unusual. In the twenty-four years Sheriff Hilton was in charge, RPSO never <u>once</u> engaged in an interactive process of seeking accommodation:

> Q.   And the Sheriff's office has employed
>      during your tenure employees with
>      disabilities, correct?
> A.   Correct.
> Q.   Okay.  With those employees who had
>      disabilities, did the Sheriff's Office
>      engage in an interactive process of
>      determining whether they needed
>      accommodations?
> A.   No.
>                                          [107]

Nothing more is needed. Because McKinney made a *prima facie* showing of a request for reasonable accommodation, and because there was no interactive process, he has established liability under the ADA/RA against RPSO.

The lack of any meaningful interactive process is highlighted by the fact that Major Hollingsworth spent no more than <u>six minutes</u> during which he *may* have attempted to find another role for McKinney before sending a letter denying his doctor-recommended accommodation and telling him to retire.[108] Summary judgment should issue.

**E.    The motion should be granted because RPSO violated the ADA/RA by taking a reasonable accommodation *away* from Deputy McKinney because they did not want him to get "special treatment."**

The ADA/RA makes it illegal for an employer to deny a reasonable accommodation to an employee with a disability.[109] As described above, Deputy McKinney asked for a reasonable

---

[107] Ex. A at 46.
[108] Ex. T at 45 (Dep. of Major Hollingsworth) ("Q. So what you were doing in that five or six minutes is talking to the
administration to try and see if there were any openings or, you know, if there was anywhere that Mr. McKinney could be placed; is that right?  A. Yeah. I tell you that I don't remember anything.")
[109] 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

accommodation of working eight-hour shifts, rather than twelve-hour shifts. For a brief moment, McKinney was accommodated, when Warden Batiste allowed McKinney to work eight-hour shifts in the kitchen without any problem.[110]

All RPSO had to do to accommodate McKinney was to do nothing.

But RPSO did not do nothing. It put a stop to the accommodation Batiste approved.

Major Hollingsworth told Warden Batiste that "if Jerry couldn't work 12 hours that he couldn't work at all."[111] Sheriff Hilton told Jerry McKinney that RPSO did not have eight-hour shifts for correction officers, and so "we feel it is time for you to retire."[112] The Sheriff repeatedly used the excuse that there were no eight-hour jobs available:

- "So that's --- that's the bottom line. There was nowhere to transfer him to on an eight-hour job."[113]

- "There were no more openings or vacancies anywhere that would fit what he was asking for."[114]

- "I've answered this two or three times today. There was no other place for Jerry."[115]

When Sheriff Hilton says he had "no more openings or vacancies anywhere," he means he "looked at the December 2018 rosters to see if there were any job positions open."[116] Unfortunately for Sheriff Hilton, Plaintiff obtained a copy of those December 2018 rosters.

What do those rosters show? They show that there _were_ eight-hour, no-firearm-certification-required jobs open. There was an opening for an accountant in the finance

---

[110] *See also* Ex. S (Dep. of Jacqueline Mitchell) at 46 ("Q. Based on your almost 15 years of experience working in Corrections in the Sheriff's Office, it's your opinion that Mr. McKinney could have continued working doing eight-hour shifts? A. Correct.")

[111] Ex. B at 45.

[112] Ex. I.

[113] Ex. A (30(b)(6) Dep.) at 66.

[114] *Id.* at 77.

[115] *Id.* at 107

[116] *Id.* at 97 ("Q. Okay. So when you say, "do all you can do," he asked for eight-hour shifts, and what you did is you looked at the December 2018 rosters to see if there were any job positions open? A. Correct."); id. at 140 ("Q. Okay, and you finally did get a request for accommodation from him in December of 2018, correct? A. Yes. Q. And you looked at that month's roster to see if there were any other positions? A. Yes. Q. But you did not wait several months to see if over the course of several months something opened up, correct? A. Yes.")

department.[117] There was a part-time assistant role open in the finance department.[118] There was a jail records position open.[119] There was a road crew relief driver position open.[120] There was a booking officer position temporarily open at the jail, while another officer was on medical leave.[121] After being confronted with these open positions, RPSO conceded that "there were at least some positions that Jerry could have been qualified for," but was not offered.[122] RPSO admitted that its prior explanation – that "there were no vacant positions" – was "not true."[123]

These positions were all in *addition* to the eight-hour jail kitchen job McKinney had already been working in, which Warden Batiste testified would have continued but for the intervention of the Sheriff.[124]

Why did Sheriff Hilton go to such lengths to avoid accommodating Jerry McKinney? At his deposition, we learned why: he is opposed to the basic idea of providing accommodations to

---

[117] Ex. A at 168.

[118] *Id.* at 169.

[119] *Id.* at 172 ("Q. That's an opening, correct? A. It appears to be, yes, sir. Q. And jail records, we already established is not POST certified, correct? A. Correct. Q. Okay, and jail records doesn't require working 12 hours a day, correct? A. No, it does not."); Ex. T at 110 ("Q. And this indicates that in the beginning of December of 2018 there was an opening in Jail Records, right? A. That's what it appears to be, yes.") The jail records position was open until December 6, 2020 it was filled with an outside hire, a white woman, more than a week after McKinney's November 27, 2020 letter seeking accommodation. Ex. T at 95.

[120] Ex. A at 174.

[121] *Id.* at 180; Ex. T at 108.

[122] Ex. A at 185.

[123] *Id.* at 186 to 187:

> Q.  . . . This response says that the monthly roster was reviewed and was seen that there were no vacant positions, which did not require POST certification that Mr. McKinney was qualified for other than Corrections, and now we know that's -- that's not true, because there's at least a part-time finance position and a -- maybe a jail records position, correct?
>
> MR. RICHARDSON: Same objection.
>
> THE WITNESS: Yes, sir, but we also started this in November and went over the November roster because all of that happened before we transferred him, and then once he was transferred and he worked the few eight-hour days that he did, then he stopped coming to work when we told him he couldn't do the eight-hour days, because we do not have eight-hour shifts, that he had to work the 12s, and he  stopped coming to work, and that's when he was terminated.

> *See also* Ex. B (Dep. of Warden Batiste) at 45-46 ("Q. Okay. Now, first of all, when Doug Hollingsworth said they don't have eight hour positions, that's not true, is it? A. No.")

[124] Ex. B at 42 ("Q. And would you have continued to allow him to work those eight-hour shifts if the Sheriff hadn't told you not to? A. Yes.")

persons with disabilities <u>at all</u>. That exchange is worth reading in full. It follows verbatim, with only objections omitted:[125]

> Q.    And why couldn't you just let him keep working eight-hour shifts at the prison?
>
> A.    Because those are not eight-hour shifts. They're 12-hour shifts, and if we let one employee take advantage of eight-hour shifts, tomorrow and the next day and the next week, there are going to be other employees there wanting to work eight hours, and you can't disrupt a facility like that with letting some work eight hours and some 12. It's like being in the military. It's a ritual. You do everything on time. You do it exactly the same every day, and we couldn't make an extension -- exception for Jerry.
>
> Q.    Because you didn't want him to get special treatment that other people might want?
>
> A.    No, it's not good for him; it's not good for the department.
>
> Q.    Right. So it would have been I guess possible to let him work eight hours a day; it just wouldn't be advisable because then other people might want to do that too. Is that your answer? . . . Is that a fair summary, Sheriff?
>
> A.    Yes.
>
> Q.    Okay. Were there any other reasons why he couldn't just have kept working eight-hour shifts at the -- at the jail?
>
> A.    I answered that earlier. It would have disrupted the operation of the department, and he would have created a situation where other employees probably would have felt like Jerry was getting special treatment, and you know, they just -- they don't like that, and they wouldn't have treated him like any other employee. Everybody has to be treated the same, and so that's how it is.
>
> Q.    Regardless of whether they're fully able or disabled, everyone has to be treated the same?
>
> A.    Yes.
>
> Q.    Okay. So you're not going to make special accommodations for -- for someone with a disability? You want everyone to be treated the same?
>
> A.    Yes.

*But see* U.S. Department of Labor, Office of Disability Employment Policy, "*Accommodations*," ("Reasonable accommodations should not be viewed as 'special

---

[125] Ex. A (30(b)(6) Dep.) at 108 to 110.

treatment.'")[126] Thus, Sheriff Hilton did not have a problem with Jerry's requested accommodation in particular. He had a problem with *the fundamental idea of accommodation*. As he testified: "any accommodation <u>at all</u> would have been an undue hardship."[127] It is not necessary to prove antipathy for persons with disabilities; the failure to reasonably accommodate is definitionally discrimination under the ADA/RA. But the fact that this was discrimination on the basis of disability is clearly demonstrated by the fact that RPSO concedes that it has given at least one employee an eight-hour shift at the jail for "family issues"[128] – but refused to do the same thing for an employee with a disability.

RPSO took away an accommodation because they did not want McKinney to have "special treatment." Summary judgment should issue.

**F.      The motion should be granted for ADA/RA retaliation because RPSO admits it fired Deputy McKinney for asking for and working the eight-hour shifts allowed by his supervisor, Warden Batiste.**

The ADA/RA makes it unlawful for any person to "intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed. . .  any right granted or protected by this chapter."[129] Requesting and using reasonable accommodations are rights protected by that chapter.[130]  Thus, an "employer may not penalize an employee for receiving a reasonable accommodation. To do so, constitutes retaliation for the employee's use of a reasonable accommodation."[131]

---

[126] Available online at https://www.dol.gov/agencies/odep/topics/accommodations
[127] Ex. A at 114 to 115. Emphasis added. This was echoed by Major Hollingsworth, who explained that Jerry McKinney should not be allowed to work the doctor-recommend eight-hour shifts because "the doctors don't run the Sheriff's Department." Ex. B at 47.
[128] Ex P at RFA 62-63 (admitting that Bobbie Duncan was assigned to eight-hour shifts at the jail "due to a family issue.")
[129] 42 U.S.C. § 12203(a); 28 U.S.C § 35.134 (Retaliation & Coercion).
[130] 42 U.S.C. § 12112
[131] [*Redacted] v. Wilkie*, Appeal No. 0120171549 (EEOC Federal Sector Decisions, May 17, 2019); *Earl v. Potter*, Appeal No. 01994514 (EEOC Federal Sector Decisions, May 21, 2002). *See also* U.S. Equal Employment Opportunity Commission, Employer-Provided Leave and the Americans with Disabilities Act, EEOC-NVTA-2016-1 (May 9, 2016) ("employer may not penalize an employee" for using a reasonable accommodation")

A claim of unlawful retaliation under the ADA/RA requires a showing that (1) the plaintiff engaged in an activity protected by the ADA/RA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action.[132]

Here, Deputy McKinney engaged in an activity protected by the ADA/RA: he requested an accommodation of eight-hour shifts and then worked about two eight-hour shifts. RPSO concedes that Jerry McKinney "had the Warden's permission to do those two eight-hour shifts,"[133] and concedes that the Warden was Jerry McKinney's "direct supervisor."[134] As a result, RPSO agrees that these actions by Jerry McKinney were not "misconduct."[135]

McKinney then suffered the adverse employment action of termination.[136] And RPSO admitted at deposition that there is a causal connection between the two: "the fact that Mr. McKinney worked about two eight-hour shifts rather than 12-hour shifts is <u>the reason why he was fired</u>."[137] This was corroborated by written discovery responses admitting that if McKinney had not worked "those eight-hour shifts, he would not have been terminated."[138] The causal connection was also made explicit in Sheriff Hilton's termination letter to Deputy McKinney, as indicated by the subject line of the Sheriff's letter: "RE: Request for Alternative Arrangement."[139]

Thus, RPSO admits that it did exactly what is forbidden by the ADA/RA: terminating an employee for requesting and using an accommodation approved by their supervisor. Retaliation

---

[132] *Mora v. Univ. of Texas Southwestern Med. Ctr.*, No. 11-10279 at *5 (5th Cir. 2012) (per curiam).
[133] Ex. A at 87; *see also id.* at 85 ("Warden Batiste did allow Mr. McKinney to work a couple of eight-hour shifts" and it was "about two shifts.")
[134] *Id.* at 84.
[135] *Id.* at 91 ("Q. . . . Was it misconduct for Mr. McKinney to ask to work eight-hour shifts and then get permission from Batiste to do it and then do it? Was that misconduct? A. No.")
[136] Ex. K (Termination Letter).
[137] Ex. A at 87 (emphasis added).

   Q. Okay. So the fact that Mr. McKinney worked about two eight-hour shifts rather than 12-hour shifts is the reason why he was fired?
   MR. RICHARDSON: Let me just object. He -- he also has asked and answered that previously, William.
   THE WITNESS: Yes.

[138] Ex. L at Response to RFA 55.
[139] Ex. K (Dec. 19, 2018 Termination Letter).

27

under the ADA/RA does not require animus or ill will – it merely requires a causal connection between the protected activity and the adverse employment action.[140] Here, that connection is undenied.

It is even more abundantly clear that this was retaliation when we look at who did the wrong compared to who got in trouble. RPSO concedes it was not "misconduct" for "Mr. McKinney to ask to work eight-hour shifts and then get permission from Batiste to do it and then do it."[141] By contrast, RPSO testifies that "Batiste should not have done that"[142] and "that was a violation of his role."[143]

But who got in trouble? RPSO <u>fired</u> McKinney, even though what he did was not misconduct. Warden Batiste, however, was not "disciplined for [it]" or even "written up for it"[144] – even though it was a "violation of his role."[145]

And we know RPSO engages in retaliation. Warden Batiste testified that:

> Q.   Okay, and so are you saying that the
>      Sheriff's Office retaliates against people?
> A.   Yes.                                          146

To sum up: RPSO admits it fired Jerry McKinney for asking for and using an accommodation approved by Warden Batiste. It put that in in the subject line of his termination

---

[140] *Mora, supra.*
[141] Ex. A at 91 ("Q. . . . Was it misconduct for Mr. McKinney to ask to work eight-hour shifts and then get permission from Batiste to do it and then do it? Was that misconduct? A. No.")
[142] *Id.* at 93
[143] *Id.* at 103 ("Q. That that was a violation of his role?  A. Yes.")
[144] *Id.* at 104 ("A. The question, was he disciplined for that? My answer is no. Q. Okay. Was he written up for it? A. No. Q. Okay. Was he terminated for it? A. No."
[145] At Ex. B at 38, Warden Batiste testified that retaliation was part of the RPSO's normal practice:

> Q. Can you tell us who gave you that information that people were doing eight hour shifts and light duty at DC-2?
> A. I'd rather not say because these people still working, and if their name is out there, they'd probably lose their job.
> Q. Why do you say that?
> A. Because that's the way the Sheriff's Department operate.

[146] Ex. B (Dep. of Warden Batiste) at 41.

letter. And while what Jerry did was not misconduct, he was fired for it. And what Batiste did was a violation of his role, but he was not even written up for it. Summary judgment should issue.

**G.    Nothing has changed. If another deputy made the same requests for accommodation as Jerry McKinney, she would be treated the same way.**

RPSO testified that it did not understand Jerry McKinney to be making a request for accommodation,[147] even though his letter said "as a person with a disability under the Americans with Disabilities Act, I am requesting reasonable accommodation."[148] Now that it has been sued and retained counsel, RPSO grudgingly admits that Jerry McKinney was making a request for accommodation.[149]

But RPSO has not done anything "to change its policies or procedures now that they understand that Mr. McKinney was making a request for accommodation."[150] There has not been any additional ADA training.[151] RPSO has not "gone back to look and see if there's any other requests for accommodation that they may have missed like Mr. McKinney's."[152] And so if it all happened again, RPSO testifies that the exact same thing would happen:

---

[147] Ex. A (30(b)(6) Dep.) at 49-50.
[148] *Id.* at 67.
[149] *Id.* at 50 ("Q. Okay, but as of today, now, you understand he was making a request for reasonable accommodation, correct? A. That's what his -- that's what his request is today, yes.")
[150] *Id.* at 51.
[151] *Id.* at 51.
[152] *Id.* at 51-52.

```
Q.    So it sounds like nothing has changed in
      terms of ADA compliance or ADA process
      after Mr. McKinney's termination.  Is that
      correct?
A.    Yes.
Q.    Okay.  So if a deputy today did the same
      things that Mr. McKinney did in terms of
      letters from his doctor and letters, he
      would be treated the same way as Mr.
      McKinney.  Is that correct?
            MR. RICHARDSON:
            Object to the form.
            THE WITNESS:
            Yes.                              [153]
```

## III.   CONCLUSION

For the reasons stated above, summary judgment should issue.

Respectfully submitted,

JERRY MCKINNEY, by and through their counsel,

/s/ William Most_____                /s/ Kerry A. Murphy___
William Most (La. Bar No. 36914)          Kerry A. Murphy, T.A. (La. Bar No. 31382)
David Lanser (La. Bar No. 37764)          Catherine E. Lasky (La. Bar No. 28652)
LAW OFFICE OF WILLIAM MOST                LASKY MURPHY LLC
201 St. Charles Ave., Ste. 114, # 101     715 Girod Street, Suite 250
New Orleans, LA 70170                     New Orleans LA 70130
T: (504) 509-5023                         Telephone: (504) 603-1500
Email: williammost@gmail.com              Facsimile: (504) 603-1503
                                          Email: kmurphy@laskymurphy.com

---

[153] Ex. A at 52.