```
                    UNITED STATES DISTRICT COURT

                    WESTERN DISTRICT OF LOUISIANA


   ──────────────────────────────────────────────────────

   JERRY MCKINNEY, SR.            NO. 1:19-CV-01399-DDD-JPM

          Plaintiff

   VS.                            JUDGE DAVID C. JOSEPH

   RAPIDES PARISH SHERIFF'S
   OFFICE AND SHERIFF WILLIAM
   EARL HILTON
                                  MAGISTRATE JUDGE
          Defendants              PEREZ-MONTES

   ──────────────────────────────────────────────────────
```

          Video deposition of JERRY L. MCKINNEY taken

          September 14, 2020 via zoom video conference

**EXHIBIT B**

### Page 10

1  Q  Okay. Which years were you in the Army?
2  A  1974, January.
3  Q  Um-hum.
4  A  1998, August.
5  Q  '88 you said?
6  A  '98.
7  Q  Oh, '98. What was your rank in the Army?
8  A  My rank at retirement was Sergeant First Class
9     E-7.
10 Q  Got it. And, your discharge, I'm assuming, was
11    honorable.
12 A  My discharge was honorable.
13 Q  Great. All right. So, when you finished with
14    the Army, then did you get into law enforcement?
15 A  No. I didn't get into law enforcement right
16    away. I had to do an interview.
17 Q  Okay. So, tell me a little bit about that.
18 A  I did an interview with the Sheriff's
19    Department, and I was attending school at LSUA.
20 Q  Okay. So, when did you first start working for
21    the Sheriff's Department?
22 A  February 1st, 1998.
23 Q  Okay. And, what was your position then?
24 A  I worked as a jailer.
25 Q  Okay. Do you remember what portion of the jail

### Page 11

1     you were assigned to? In other words, I know
2     there is a D. I think there is maybe a C. Do
3     you know what jail position you were in?
4  A  I worked at the main jail, DC-1.
5  Q  DC-1?
6  A  The main jail.
7  Q  All right. And, about how long were you a
8     jailer?
9  A  From 1998 to 2008.
10 Q  Okay. I'm going to get into that in a second.
11    There's a couple of other questions I just have
12    to ask. I believe I know the answer to this
13    already. But, in the last ten years you haven't
14    been convicted of any crime; correct?
15 A  No, sir.
16 Q  Great. All right. And, have you -- other than
17    this lawsuit, have you ever filed a lawsuit
18    before?
19 A  No, sir.
20 Q  Okay. Have you ever been sued?
21 A  No, sir.
22 Q  Okay. And, have you ever -- other than this
23    claim, have you ever filed an EEOC charge?
24 A  No, sir.
25 Q  Have you -- other than today, have you ever

### Page 12

1     given a deposition?
2  A  No, sir.
3  Q  All right. So, 1998 to 2008 you worked at DC-1.
4     Does that sound about right?
5  A  I worked at DC-1 and at DC-2.
6  Q  Okay. And, you were a jailer; is that correct?
7  A  I was a jailer.
8  Q  Okay. And, what kind of hours did you work as a
9     jailer?
10 A  We had a 12-hour shift.
11 Q  Okay. We're going to talk later about what
12    happens in, you know, 2017, 2018. But, what I'm
13    talking about now is just this time, the '98 to
14    2008. During that period of time did you ever
15    work 8-hour shifts as a jailer?
16 A  It was a 12-hour shift.
17 Q  Okay. 12-hour shift is required for a jailer;
18    is that true?
19 A  That was -- that's what I was assigned to work,
20    12-hour shift.
21 Q  And, that's what you always did work from 1998
22    to 2008?
23 A  Yes.
24 Q  Okay. That was my question though, was the
25    12-hour shift a requirement of the job to be a

### Page 13

1     jailer?
2  A  When I was hired on it was a 12-hour shift as a
3     jailer.
4  Q  Okay. All right. So, you did that to 2008.
5     And, then what happened after 2008?
6  A  In 2008 I was interviewed for a job as
7     courthouse security.
8  Q  Okay. Kind of like as a bailiff?
9  A  As a bailiff.
10 Q  Okay. All right. So, when you were a jailer
11    from the '98 to 2008 were you POST certified?
12 A  I was POST certified.
13 Q  Okay. When did you first receive your POST
14    certification?
15 A  In 1998.
16 Q  Okay. Now, how often did you have to requalify
17    with your weapon after you received POST
18    certification?
19 A  We qualified with our weapon on an -- annually
20    on our birthday month.
21 Q  Okay. So, correct me if I'm wrong, but my
22    understanding is you have to qualify every year
23    with your weapon to remain POST certified; is
24    that correct?
25 A  That is correct.

Page 14

1  Q  Okay. All right. So, moving forward, you
2     applied for a position as a bailiff, and I'm
3     assuming you got that job.
4  A  I did.
5  Q  Okay. And, when you got that job you were POST
6     certified at that time; correct?
7  A  I was.
8  Q  Was POST certification a requirement to be a
9     bailiff?
10 A  I'm not sure if it was a requirement, but I was
11    POST certified.
12 Q  Did you carry a weapon while you were a bailiff?
13 A  I carried my firearm while I was a bailiff.
14 Q  Was that a requirement that bailiffs have
15    firearms?
16 A  The position I had was courthouse security. I
17    was required to carry a firearm.
18 Q  Okay. And, in order to carry a firearm you have
19    to be POST certified, right, to carry a firearm?
20 A  We have -- you have to be POST certified to
21    carry a firearm.
22 Q  Okay. That's what I thought. All right. So,
23    how long did you work as a bailiff?
24 A  I worked as a bailiff from 2008 to 2018.
25 Q  Okay. All right. So, let's talk a little bit

Page 15

1     about while you were working as a bailiff. I
2     understand at some point you had a stroke. Does
3     that sound about right?
4  A  Yes, that's right.
5  Q  Do you remember when it was that you had your
6     stroke?
7  A  I had a stroke on Wednesday, November the 29th,
8     2017.
9  Q  Okay. And, prior to that stroke that we're
10    talking about in November of 2017 had you ever
11    had a stroke before then?
12 A  No, sir.
13 Q  Okay. So, tell me, after you had your stroke,
14    how long were you out of work?
15 A  I was out of work from November, 2017 to
16    February, 2018.
17 Q  Okay. All right. And, tell me what kind of
18    problems you had following your stroke. Let me
19    be specific. I'm talking about 2017 until
20    February of 2018, that period of time. What
21    kind of issues and difficulties were you having
22    then?
23 A  I had issues with my hand and arm.
24 Q  Um-hum.
25 A  And with my speech.

Page 16

1  Q  Okay. All right. Let me back up a second
2     because at that point you were -- you were a
3     bailiff, right, when you had the jail -- I'm
4     sorry -- strike that -- You were courthouse
5     security when you had your stroke; is that
6     right?
7  A  That's correct.
8  Q  Okay. Tell me the type of things you would do
9     in courthouse security. What type -- I'm
10    talking about before your stroke. What were
11    your normal job duties, assignments, what type
12    of things would you do on a day-to-day basis?
13 A  I would -- I would secure and check my courtroom
14    each morning --
15 Q  Okay.
16 A  -- prior to starting court. I would ensure my
17    judge's chambers was cleared prior to her coming
18    to work, and I would receive the -- the inmates
19    for court that day coming to my courtroom, and I
20    would secure them in a holding cell to have them
21    appear in front of the -- the -- until they
22    would appear in front of the judge.
23 Q  Okay. I'm going to give you a second and I'm
24    going to ask you something else; okay? Just
25    take your time. Let me know when you're ready

Page 17

1     and we'll go from there.
2  A  I'm ready, sir.
3  Q  Okay. And, like I said, if you need to take a
4     break, it's okay. It's just, you know, part of
5     the process. It just takes a little while, and
6     I don't know the answer to this because I wasn't
7     there. So, I'm just trying to understand; okay?
8     All right. So, tell me when you were though
9     before that, right, when you were working for
10    the ten years in jail -- in the jail, what type
11    of duties did you have to do while you were in
12    the jail?
13 A  We had to do head count.
14 Q  Okay.
15 A  Medication and feeding of the inmates.
16 Q  Okay.
17 A  Also, we did church settings.
18 Q  Um-hum.
19 A  And, get the inmates ready if they had
20    appointments or court.
21 Q  All right. I know we're going to talk later
22    about after your stroke and when you went back
23    to the jail. I'm just trying to understand
24    generally speaking in the jail setting, since
25    you worked there for ten years, is it loud if

Page 22

1    many rounds?
2  A  We was -- we are issued 60 rounds of ammo for
3    qualification.
4  Q  Okay. And, in addition to those three times,
5    did you ever go and do practice at the range?
6  A  I went to do practice at the range on my own
7    after work.
8  Q  Okay.
9  A  And, also, I did practice with a class where I
10   -- a class I went to practice along with a
11   class, also.
12 Q  Okay. Do you know about how many times you went
13   to practice?
14 A  I practiced on my own -- on my own a couple of
15   weeks after work after 4:30 on my own.
16 Q  Okay.
17 A  And, I went out to practice in July on my own
18   after work.
19 Q  Okay.
20 A  And, I believe either in October or November I
21   went out and they had a class, a corrections
22   class going on. So, the instructor say I can
23   come out and practice with the class, and I did.
24 Q  Okay. So, when you went to practice a couple
25   weeks after 4:30, how many rounds were you

Page 23

1    shooting during those practice sessions?
2  A  I shot my own ammo.
3  Q  Okay. Do you know about how many rounds you
4    shot?
5  A  I practiced as if I was qualifying, so I did 60
6    rounds.
7  Q  60 rounds. And, you said -- I'm just trying to
8    understand. You said you did that for a couple
9    of weeks. So, I'm not sure how many times a
10   week you were doing that. Do you have kind of a
11   general idea how many trips you took for
12   practice?
13 A  Usually I would go out on a Tuesday and a
14   Friday, and I spent my time on Saturday, also,
15   on my time at the range.
16 Q  Okay. So, that would be like three times a
17   week?
18 A  Three times a week, roughly.
19 Q  Roughly. And, about how many weeks do you think
20   you did that?
21 A  Maybe three weeks in July and a few -- few --
22   maybe two weeks in October.
23 Q  Okay. And then, before you would actually
24   qualify or attempt to qualify at the range, did
25   you do some practice rounds before the actual

Page 24

1    qualifying rounds?
2  A  We was given practice rounds before the
3    qualification -- before the qualifications.
4  Q  I see. All right. So, to make sure I'm clear
5    here, you attempted to qualify in March, July
6    and October or November of '18. Does that sound
7    right?
8  A  No, that's not right.
9  Q  Okay. Please, correct me.
10 A  In March I was -- I went to the range in March
11   after my stroke.
12 Q  Okay, yep.
13 A  And, I was not allowed by the firearm
14   instructor. He would not let me qualify because
15   he said I didn't look -- look well.
16 Q  Okay.
17 A  So, I didn't -- I didn't qualify in March.
18 Q  I see. Did you shoot at all in March?
19 A  I didn't shoot. I didn't shoot at all in March.
20 Q  I see. Okay. So, then in July of '18 that's
21   when you did attempt to qualify and you also
22   were shooting on your own practice rounds;
23   right?
24 A  Yes.
25 Q  Okay. I understand. And, then in October and

Page 25

1    November -- you said in October or November of
2    '18 you attempted to qualify as well; correct?
3  A  In October I was -- I went to practice, but in
4    November I attempted to qualify.
5  Q  I see. And, then you had some practice on your
6    own in July?
7  A  October.
8  Q  And October. Any other that months you can
9    think of?
10 A  I can't remember any other month, sir.
11 Q  Okay. That's okay. All right. So, that
12   happens. You were unable to qualify. At some
13   point did you -- were you moved from being a
14   bailiff to another position?
15 A  Yes, I was.
16 Q  Tell me about that. How did that happen?
17 A  I was moved from bailiff and assigned to
18   Detention Center 3.
19 Q  Detention Center 3, okay. And what were you
20   assigned to do in Detention Center 3? What was
21   your job duty when you got transferred?
22 A  I was, according to the letter, I was assigned
23   as a corrections.
24 Q  Corrections officer?
25 A  Corrections officer.

Page 26

1  Q  Same position that you had done back in 1998 to
2     2008?
3  A  Yes, sir.
4  Q  Working 12-hour shifts in the jail?
5  A  Yes, sir.
6  Q  Okay. So, tell me why was it that you were
7     transferred from bailiff to DC-3?
8     MR. LANSER:
9        I'm going to object. That calls for
10       speculation, but you can go ahead and answer,
11       Mr. McKinney.
12 A  I was told I was transferred from bailiff to
13    Detention Center 3 because I did not qualify
14    with my weapon.
15 Q  Okay. So, let me explore that a little bit.
16    You have to have a weapon to be in courtroom
17    security; right?
18 A  Yes, sir.
19 Q  And, in order to have a weapon you have to be
20    POST certified with that weapon; right?
21 A  Yes, sir.
22 Q  And, you weren't POST certified with that weapon
23    as of March of 2018 because you couldn't
24    qualify; correct?
25 A  I was still -- I was still -- I was still

Page 27

1     certified with my weapon in March until I went
2     back to requalify.
3  Q  Right. But, you never did requalify; right?
4  A  No, sir, I did not.
5  Q  All right. So, what I'm getting at is when you
6     were transferred in November of 2018 to DC-3 you
7     weren't qualified with your weapon anymore.
8  A  No, sir, I was not.
9  Q  Okay. And, that's what they told you, that you
10    had to be transferred somewhere else because you
11    weren't qualified with your weapon?
12 A  That's what I was told, sir.
13 Q  Who told you that?
14 A  I received a letter from my supervisor, and I
15    was told that I was being transferred because I
16    did not qualify.
17 Q  I see. And, we'll get to some of those letters.
18    I think I have those and we'll go through them.
19    All right. So, tell me this now. When you go
20    to be transferred to DC-3, right, as a
21    corrections officer, what did you do? Like day
22    one when you got there, what was your position?
23    What did you do that day?
24 A  I reported to my lieutenant.
25 Q  And, who was that?

Page 28

1  A  I'm trying to remember his name, sir.
2  Q  Okay.
3  A  Lieutenant Nichols, Lieutenant Nichols.
4  Q  Okay.
5  A  And, I reported to Sergeant Floyd. My sergeant
6     was named Floyd.
7  Q  Sergeant Floyd?
8  A  Floyd. I'm trying to speak -- speak as clearly
9     as possible to you.
10 Q  That's great. Thank you. All right. What
11    about Batiste; did you report to him that day?
12 A  No. I did not report to Warden Batiste on the
13    first day I was there.
14 Q  When you started working that first day were you
15    having difficulties doing the job?
16 A  I was still recovering from a stroke, sir.
17 Q  Okay. So, tell me a little bit about what they
18    had you doing that first day and what
19    difficulties you were having.
20 A  On the first day I reported to work my
21    lieutenant, Lieutenant Nichols, and Sergeant
22    Floyd, they sat me down and I -- and they said
23    we know your situation and you're going to work
24    in the control center with me for the day.
25 Q  And, did you work 12 hours that day?

Page 29

1  A  Yes, sir, I did.
2  Q  Okay. What kind of difficulties, if any, were
3     you having that first day?
4  A  I was having difficulties to the fact that I was
5     -- I was trying to figure out why I was
6     transferred.
7  Q  Were you having difficulties doing the job that
8     first day in corrections?
9  A  If you're asking me did I do the job involving
10    inmates on the first day, the answer is no.
11 Q  Okay. Did you do the job?
12 A  I was --
13 Q  Go ahead. I'm sorry to interrupt you.
14 A  I was -- I was put in the control center with
15    the lieutenant and the sergeant.
16 Q  Okay. So, that was my question. Did you have
17    any difficulties on that first day performing
18    the job?
19 A  No, sir.
20 Q  Okay. So, at some point did you then start at a
21    later date did you have a problem performing the
22    job in DC-3?
23 A  Again, I was not involved with any inmates.
24 Q  Okay. So --
25 A  So, I was -- I was in the control center with

Page 46

1  Q   I'm correct, all right. All right. But, you do
2      believe you could have worked eight hours in the
3      kitchen; correct?
4  A   Yes. I could have worked eight hours.
5  Q   Okay. And, let me -- let me ask you this, too.
6      So, going back to corrections, we talked about,
7      you know, the eight and 12-hour issue. But,
8      also, in corrections, to make sure I understand,
9      the doctor and you also believed you couldn't
10     work in corrections because you couldn't be
11     around loud noises, which is part of working in
12     corrections. Is that true?
13 A   It's somewhat true.
14 Q   Okay. Go ahead.
15 A   Keep in mind all of corrections is not dealing
16     directly with the inmates. There is some
17     positions in corrections that is intake,
18     discharge, administration, commissary, to name a
19     few.
20 Q   I understand. But, what you were assigned to
21     was in corrections working the 12-hour shifts
22     which would have been eventually dealing with
23     inmates.
24 A   That's correct.
25 Q   All right. And, when you're dealing with that I

Page 47

1      think you told me before there's loud noises
2      involved.
3  A   That's correct.
4  Q   And, you can't really stop that; right? I mean,
5      you're walking down there and they're not going
6      to be quiet if you tell them to be quiet; right?
7  A   Ain't no way possible they're going to be quiet.
8  Q   I understand. All right. So, that's not
9      something we can remove. If you're dealing with
10     that, you're going to deal with the inmates and
11     that's going to be loud.
12 A   That's correct.
13 Q   All right. So, let me ask you this. Talking
14     about working in corrections, okay. If you're
15     back where they had assigned you in in DC-3 in
16     2018, do you think it would have been dangerous
17     for you to work in corrections?
18 A   With my medical conditions, yes.
19 Q   Okay. So, my next question, do you think it
20     would have been dangerous for you -- for the
21     inmates if you were to work in corrections?
22     And, I'll give you an example. For example, if
23     they are getting into a fight and you have to go
24     and stop it and so forth, do you think that
25     would have been a danger to the inmates if they

Page 48

1      would have had you working in corrections?
2  A   It would have -- it would have been a danger to
3      me.
4  Q   Do you think it would have been a danger to the
5      inmates, too, or just to you?
6  A   I feel that it would be dangerous to both
7      because, if I had a medical condition, I
8      couldn't help an inmate if he get in a fight.
9  Q   Right.
10 A   So, but it would have been a danger to both of
11     us.
12 Q   I understand.
13 A   Based on my medical condition.
14 Q   Got it. You just wouldn't be able to perform
15     those duties that would have been required as a
16     correctional officer because of your medical
17     condition.
18 A   Yes, sir.
19     MR. LANSER:
20         I'm going to object to the extent that
21     there is a legal conclusion, but go ahead and
22     answer, Mr. McKinney.
23 A   I feel like that is correct.
24 Q   Okay. And, that's regardless whether you're in
25     there eight hours or 12 hours, because of your

Page 49

1      medical condition, you can't work in that
2      situation.
3  A   It should be a 12-hour situation because I was
4      assigned for a 12-hour shift.
5  Q   That's fair. All right. Now, let's talk about
6      you didn't go -- you sent in your letters or --
7      or -- that's a bad question -- You called in and
8      told them you couldn't work because of your
9      doctor's note and so forth. And, I'm assuming
10     you never did go back in and work for the
11     Sheriff's Office. Is that correct?
12 A   That is correct, sir.
13 Q   Okay. And, I know there's some letters that you
14     have put together that you had sent over to the
15     Sheriff's Office. Here's my question. What did
16     you want the Sheriff's Office to do? Like, in
17     other words, you can't work in corrections.
18     What did you want them to do for you?
19 A   I -- I -- I would have liked to have had the
20     opportunity to recover from my stroke and for
21     the Rapides Parish Sheriff's Department to find
22     me another job or leave me where I was until I
23     get a chance to qualify with my weapon. That's
24     all I was asking.
25 Q   Okay. So, let me just make sure I understand.

Page 54

1     Sheriff's Department before; correct?
2 A  No, sir.
3 Q  You had never worked in the kitchen of Rapides
4     Parish before you got transferred there;
5     correct?
6 A  No, sir.
7 Q  But, you had worked in corrections for ten years
8     before that; correct?
9 A  Yes, sir.
10 Q  Okay. And then the firing range, had you ever
11    worked at a firing range before?
12 A  No, sir.
13 Q  How could you work in the firing range if you
14    were hypersensitive to loud noises?
15 A  Understand the firing range is not -- Well, you
16    should know this. It's not all -- all firing
17    every day on the range.
18 Q  Okay.
19 A  There is office work involved, also, office
20    environments, keeping records.
21 Q  Let me ask you this. You mentioned that you
22    were having difficulty with loud noises. When
23    did that start after your stroke?
24 A  It started after I had my stroke.
25 Q  Okay. So --

Page 55

1 A  When I had my stroke.
2 Q  Let me ask you this. How were you able -- if
3    you have a hypersensitivity to loud noises, how
4    was it that you were able to go to the shooting
5    range and shoot?
6 A  I had no choice.
7 Q  What do you mean?
8 A  I had to go shoot or lose my pay, my state pay.
9 Q  You would lose your state supplemental pay if
10   you're not POST certified; right?
11 A  For some people.
12 Q  But, I mean, that's for everybody; right? I
13   mean, that's how it works.
14 A  Well --
15 Q  Did you lose your state supplemental pay?
16 A  I -- I lost -- I lost -- I lost -- I lost some
17   pay.
18 Q  When did your state supplemental pay stop?
19 A  If I'm not mistaken, it stopped in the latter
20   part of -- latter part of the last part of
21   November, I believe, if I'm not mistaken.
22 Q  Okay. So, you were due to be recertified. In
23   other words, you had to recertify by March of
24   2018; right? That's when your certification
25   with your firearm expired, March of 2018; true?

Page 56

1 A  I was -- I was -- I went to the range in March,
2    but I was not allowed to shoot my weapon because
3    I had -- was still recovering from my stroke.
4    It wasn't safe.
5 Q  Right.
6 A  So, therefore, I was -- went back in July.
7 Q  Right. But you've got to recertify every year;
8    right?
9 A  Right. Recertification is for every year. You
10   are correct.
11 Q  Right. And so, according to what I understand,
12   your recertification was suppose to be in March
13   of 2018. That was your deadline to get
14   recertified; right?
15 A  It should have been March of 2018. You are
16   correct.
17 Q  Got it. And, you got state supplemental pay in
18   April of 2018; right?
19 A  I don't know. I don't know for sure.
20 Q  You are not suppose to get state supplemental
21   pay if your -- if your firearm certification is
22   expired; correct?
23 A  I can't answer that because I don't really know.
24 Q  Do you think you can get -- just make sure we're
25   clear on the record here. So, a law enforcement

Page 57

1    officer for 20 years, do you believe that you
2    can get state supplemental pay if you are not
3    certified with your firearm?
4 A  My -- my -- my opinion, I should not get state
5    supplemented pay if I'm not certified with my
6    weapon, but there's stipulations to everything.
7 Q  Okay. Did you ever return -- I'm sorry.
8 A  Go ahead.
9 Q  Did you ever receive state supplemental pay that
10   you returned to the state because you were not
11   qualified with your firearm?
12 A  I don't -- I don't recall ever receiving state
13   supplemented pay that I was not entitled to.
14 Q  Okay. You would agree with me, if you received
15   state supplemental pay in April of 2018, that
16   you should not have received that; right?
17 A  I can't agree with you because I don't know what
18   time they stopped my supplemented pay.
19 Q  Okay. Well, let me make it more broad or more
20   narrow, actually. If you received state
21   supplemental pay after March of 2018, it should
22   have been returned.
23 A  You are asking me if it should have been
24   returned?
25 Q  Yes, sir.

**Page 58**

1  A   I don't know, sir. I don't know what -- what
2      the finance instructor -- firearm instructor,
3      what he or she did in reference to my state pay.
4  Q   But you knew as of -- Go ahead.
5  A   I'm finished.
6  Q   Okay, yeah. I'm just trying to make sure I
7      understand. You knew as of May of 2018 you
8      weren't certified with a firearm.
9  A   Yes. I knew I wasn't -- I hadn't -- yes, I knew
10     I hadn't qualified with my weapon, but I was in
11     the process, still in the process of trying to
12     qualify with my weapon.
13 Q   Anybody ever tell you -- well, let me ask you
14     this. Is it your belief that if you don't --
15     you're not certified, but you're trying to
16     certify that you can still collect supplemental
17     pay?
18 A   Can you repeat the question, sir?
19 Q   Yeah. So, is it your belief that, if your
20     certification ends but you're trying to
21     recertify, you can still collect your state
22     supplemental pay while you are trying to
23     recertify?
24     MR. LANSER:
25         I'm going to object to a legal

**Page 59**

1      conclusion, but go ahead.
2  A   No one never told -- no one ever told me or
3      anyone else that I couldn't.
4  Q   When you were working in the jail in the kitchen
5      those 8-hour days, do you remember when we
6      talked about that?
7  A   Yes, sir.
8  Q   What were you putting on your time sheet? How
9      many hours a day?
10 A   I don't control my time sheet, sir.
11 Q   How many hours a day were you getting paid for?
12 A   I don't control my time sheet, sir.
13 Q   Okay. But, how many hours a day were you
14     getting paid for?
15 A   I don't mean to be disrespectful, sir, but I
16     don't -- I don't -- I didn't see my time sheet,
17     so I don't know what the time sheet was being
18     recorded as me working.
19 Q   You never initialed your time sheets?
20 A   I never -- I never initialed my time sheet at
21     DC-3 that I can remember initialing them.
22 Q   All right. We'll go through that in a little
23     bit. You saw your paycheck though; right?
24 A   I saw my -- I saw my paycheck for the month of
25     November.

**Page 60**

1  Q   Okay. And, you agree with me that you were
2      being paid for 12 hours on each of those days
3      even though you worked eight hours on some of
4      those days; true?
5  A   Like I say, sir, I didn't deal with my time
6      sheet. I don't know what the secretary or the
7      timekeeper put on my time sheet for those days.
8  Q   But, let me ask you this. When you got your
9      paycheck did you look at your paycheck to see
10     how much it was for?
11 A   Probably not, because I figured it was the same
12     as always.
13 Q   Okay. But you knew that you were working less
14     hours than a full 12-hour shift. So, it didn't
15     dawn on you that, hey, look, I'm getting
16     overpaid here because I'm getting paid 12-hour
17     days and I'm only working 8-hour days?
18 A   No disrespect to you, sir. I don't do my time
19     sheets. I don't know what it was recorded on my
20     time sheet, either eight or 12. I don't know.
21 Q   But, you would agree with me, if you were
22     working eight, you shouldn't get paid for 12;
23     right?
24     MR. LANSER:
25         I'm going to object to the relevance

**Page 61**

1      and for legal conclusion.
2  Q   You can answer.
3  A   I don't know what my timekeeper put on my time
4      sheet for the days I worked.
5  Q   Okay. Let me just make sure I understand. You
6      knew how many hours you worked each day.
7  A   Yes, sir. Yes, sir. I know I worked eight
8      hours; but, again, I don't know what the
9      timekeeper put on the time sheet.
10 Q   I just want to make sure I understand. Under
11     oath you're telling me that when you got your
12     paystub and you looked at that amount, right,
13     that shows 12 hours every day that you never
14     realized that you were getting overpaid?
15 A   Like I say, I don't know what the timekeeper put
16     on my time sheet.
17 Q   You did see your check. I just want to make
18     sure you saw your check.
19 A   My check is direct deposit to my bank.
20 Q   You know how much was deposited in your bank
21     account; right?
22 A   It's been awhile ago, so I -- I don't know.
23 Q   You never looked at it?
24 A   I can't recall if I looked at it or not, sir.
25 Q   All right. Let's talk about the range when you

Page 62

1   were indicating that you were wanting to try to
2   qualify a couple of times. Did your doctor ever
3   prohibit you from firing your firearm?
4 A I believe back in July the doctor had indicated
5   that I should not try to shoot my weapon because
6   my hand was weak and the noise level. So, I
7   think back in July.
8 Q But, nevertheless, you did go and attempt to
9   requalify with your weapon.
10 A Like I said before to you, sir, I had to try to
11   qualify or lose my pay.
12 Q Okay.
13 A And, to me, it was important to keep my pay to
14   support my family.
15 Q You're talking about state supplemental pay when
16   you say --
17 A The supplemented pay, yes.
18 Q All right. Did you ever tell your doctor that
19   you were shooting despite his recommendation
20   that you not shoot?
21 A He signed the paperwork that I shouldn't shoot.
22 Q He signed paperwork saying you should shoot?
23 A Should not. Should not. Should not.
24 Q Should not shoot?
25 A Should not shoot my pistol.

Page 63

1 Q Right. So, here is what I'm trying to
2   understand. He signs the paperwork in July, and
3   then you go and try to qualify and you're
4   shooting the weapon despite his recommendation.
5   Did you ever go back in and say, hey, look, Doc,
6   I know you told me I shouldn't be shooting
7   weapons because I have strength issues and it's
8   noisy, but I've been doing it anyway. Did you
9   ever tell him that?
10 A No, sir, I did not tell my doctor.
11 Q Why not?
12 A I felt like he would have told me not to. So, I
13   said I was trying to do what the department
14   asked me to do to qualify. So, I didn't bother
15   to tell my doctor about I was trying to qualify.
16 Q Well, don't you think it's important to be
17   honest with your doctor?
18 A I think it's very, very important to be honest
19   with my doctor.
20 Q So, you had a letter in November where the
21   doctor writes that you can't be around loud
22   noises, the one you told me about before, right,
23   that you showed to Warden Batiste?
24 A Yes.
25 Q All right. But, in fact, you had been shooting

Page 64

1   at the range multiple times around loud noises;
2   right?
3 A With earplugs on and earplugs in my ears.
4 Q I understand. But, even with earplugs in your
5   ears it's still noisy.
6 A I guess you can say that.
7 Q Yeah. So, why did you have the doctor writing
8   you a letter saying you can't be around loud
9   noises when, in fact, you had been around loud
10   noises?
11 A I didn't have the doctor write -- His diagnosis
12   indicated I couldn't be around loud noises. So,
13   he wrote the letter on my behalf to let them
14   know about the loud noises.
15 Q But, that's based on what you were telling him;
16   right?
17 A That's based on what he determined when he
18   examined me.
19 Q Well, I thought you had an ear test done; right?
20 A I can't recall if I had an ear test or not.
21 Q Do you ever recall any test saying that there
22   was an objective finding that you had any kind
23   of sensitivity to loud noises?
24 A I can't recall, sir.
25 Q How can the doctor determine or, according to

Page 65

1   you, how did the doctor determine you were
2   sensitive to loud noises other than what you
3   told him?
4   MR. LANSER:
5       Objection to speculation, but go ahead.
6 A Can you repeat the question?
7 Q Yeah. How did the doctor determine you were
8   sensitive to loud noises?
9   MR. LANSER:
10      Same objection, but you can answer as
11   best as you know, Mr. McKinney.
12 A I guess based -- based on his knowledge as a
13   doctor.
14 Q Based on did he do any tests to determine if you
15   were sensitive to loud noises?
16 A I had some tests done, but I can't recall what
17   they were, sir.
18 Q You told the doctor you were sensitive to loud
19   noises; true?
20 A No, sir.
21 Q You never told them that?
22 A I don't recall ever having that conversation
23   with the doctor.
24 Q All right. I just want to make sure I
25   understand because I'm going to depose him on

Page 66

```
 1      Wednesday.
 2   A  Yes.
 3   Q  Okay. Just to make sure I understand, your
 4      understanding is he determined you were
 5      sensitive to loud noises and you never told him
 6      that ever?
 7   A  I don't recall ever telling my doctor about loud
 8      noises.
 9   Q  Okay. Let's talk a little bit about some
10      documents. The first thing is going to be
11      Exhibit 1. David, this is the complaint. I'm
12      going to see if we can get Wes to pull it up.
13      While he's doing that, Mr. McKinney, what's a
14      rover? You ever heard that term before, rover?
15   A  Rover?
16   Q  Yes, sir.
17   A  A rover in --
18   Q  In corrections, the term rover.
19   A  That's a person that moves -- moves from -- that
20      is a person in the -- in the -- in the jail
21      setting that moves from zone to zone or help out
22      in the front office.
23   Q  Okay. So, what I -- have you -- I'm assuming
24      you've seen this before, right, Mr. McKinney?
25      It's your lawsuit.
```

Page 67

```
 1   A  Yes, sir.
 2   Q  All right. Go down. Wes, go down a little bit.
 3      I want to go to No. 2 real quick. Right there.
 4      Do you see on No. 2 it says, "When Deputy
 5      McKinney returned to work after his stroke in
 6      February of 2018 he resumed his previous
 7      position working 8-hour shifts stationed at the
 8      metal detectors at the courthouse, a job he
 9      could do with his health restrictions." But,
10      this is the one in the second sentence, "But, on
11      November 8th, 2018, Deputy McKinney was
12      transferred to a corrections officer position in
13      a detention facility with 12-hour shifts." Is
14      that correct?
15   A  Yes, sir.
16   Q  Okay. Just making sure. The, uh -- Let me ask
17      you something else. The Sheriff's Office, they
18      have a policy and procedure manual; do they not?
19   A  To the best of my knowledge they have a -- they
20      have one.
21   Q  Okay. And, in that they do indicate -- I mean,
22      I can show it to you. It's Paragraph 19. But,
23      they do indicate that they don't discriminate in
24      the hiring or employment based on race, color,
25      religious creed, national origin, disability,
```

Page 68

```
 1      etcetera. It's actually right here in front of
 2      you, Paragraph 19. Do you agree with kind of
 3      what you have there in your complaint?
 4   A  Yes, sir.
 5   Q  Okay. And, once you did advise -- you know, we
 6      talked about that letter that you had from your
 7      doctor about how you couldn't work the 12 hours
 8      and you were sensitive to noises. When you
 9      brought that to the warden, they did have a
10      discussion with you; did they not?
11   A  Warden -- Warden Batiste is the only person that
12      talked to me about my situation, the only
13      person.
14   Q  But, he did have a conversation with you?
15   A  Warden Batiste is the only person that talked to
16      me about my situation.
17   Q  Did you know Batiste before you got transferred?
18   A  I had known Warden Batiste since 1988.
19   Q  Okay. Did you guys hang out together socially?
20   A  No, sir.
21   Q  Do you know if he has a lawsuit against the
22      Sheriff's Office?
23   A  I don't know anything of Warden Batiste's
24      personal business.
25   Q  When is the last time you spoke to Warden
```

Page 69

```
 1      Batiste?
 2   A  It's been some months ago.
 3   Q  Okay. Let me ask you this. When you were able
 4      to return to work did you get a doctor's slip in
 5      February of '18 after your stroke indicating you
 6      could return to work?
 7   A  Yes, I did, sir.
 8   Q  Okay. Let's pull up Exhibit 2, please. David,
 9      this is the, uh -- from the doctor records. Can
10      you see that? Look at the one on the right. Do
11      you see 2/27/18 patient can go back to work?
12   A  Yes, sir.
13   Q  So, you did get that return-to-work slip from
14      the doctor; right?
15   A  Yes, I did, sir.
16   Q  And, you provided it to your employer and you
17      went back to work as a bailiff; right?
18   A  Yes, I did, sir.
19   Q  All right. The one on the left though, the
20      7/31/18, that's the one I was referring to
21      earlier where it says, "Patient is not allowed
22      to shoot a gun." Did you see that?
23   A  Yes, sir.
24   Q  Did you give that to anybody at the Sheriff's
25      Office?
```

Page 70

1  A   Yes, sir. I did, sir.
2  Q   Who did you give it to?
3  A   Captain Michael Jones.
4  Q   Who is that?
5  A   He was my supervisor in charge of bailiffs.
6  Q   In charge of bailiffs?
7  A   Yes, he was.
8  Q   Did you give it to anybody at the shooting range
9      when you were over there shooting weapons?
10 A   No, sir, I did not.
11 Q   Do you think that it was dangerous for you to be
12     shooting weapons when the doctor said you're not
13     allowed to shoot?
14 A   Like I stated before, sir, to you, no disrespect
15     to you, like I stated before, I was trying to
16     qualify to keep my state pay to help my family's
17     financial situation.
18 Q   But, don't you think, Mr. McKinney, that if
19     you're doing that outside of doctor's order
20     that's dangerous to yourself?
21 A   I was -- I -- I -- Like I say again, sir, I was
22     doing it to help my family.
23 Q   You have to answer my question though. It's
24     kind of a yes or no, and I don't mean any
25     disrespect. I just need to get a yes or no

Page 71

1      answer. Do you believe that was dangerous to
2      yourself?
3  A   Yes, probably so.
4  Q   Do you believe it was dangerous to the other
5      people who were shooting at the range?
6  A   Yes, probably so.
7  Q   Okay. The next thing is an unemployment. I
8      just want to kind of touch on this briefly.
9      This is Exhibit 3. You did apply for
10     unemployment after your termination, I guess;
11     right?
12 A   Yes, sir.
13 Q   Just tell me where that left off. Did you
14     ultimately receive unemployment?
15 A   I did, sir.
16 Q   Okay. And, how long did that last?
17 A   I think it was -- well, if I'm -- if I'm
18     correct, it lasted for one year, sir.
19 Q   Okay. So, do my math for me. You're not still
20     on it; right?
21 A   Oh, no, no, not -- no, not at all.
22 Q   All right. So, tell me this. I want to kind of
23     pump numbers on this briefly. When you were
24     working, before you got terminated, what were
25     you earning a year at the Sheriff's Office?

Page 72

1  A   I'm not sure, sir, what I was earning.
2  Q   Okay. So, here's what I need to understand. As
3      part of the lawsuit, are you claiming that you
4      are losing any wages because you've been
5      terminated?
6  A   Yes. I'm losing wages.
7  Q   Okay. That's what I need to know. Okay. So,
8      let's go through that. What wages are you
9      losing?
10 A   I'm losing my -- if I was not terminated, I
11     would still be working.
12 Q   Okay. And, that's what I need to know. How
13     much were you earning?
14 A   I can't calculate the numbers in my head right
15     now, so I don't know. You must understand I
16     have had a stroke.
17 Q   Look, I understand.
18 A   And as of a result of my stroke, I'm not the
19     sharpest pencil in the classroom right now.
20 Q   I understand.
21 A   So, you're asking me some questions. I'm doing
22     the best I can to answer your questions, but --
23 Q   I appreciate it. It's just, if we get to trial
24     -- Go ahead. I'm sorry. I didn't mean to
25     interrupt you, Mr. McKinney. You want to take

Page 73

1      five, Mr. McKinney?
2  A   Yes.
3  Q   Let's take five, guys. Let's do a little
4      five-minute water break, bathroom break. Just
5      let us know when you're back on. Like I said,
6      just don't talk to anybody in between. And,
7      when you're ready, just take your time, and
8      we'll go back on and try to wrap this thing up
9      after we get through some more documents; okay?
10 A   Thank you, sir.
11 Q   Yes, sir.
12 (Off the record at 11:43)
13 (Back on the record at 11:50)
14 BY MR. RICHARDSON:
15 Q   All right. So, what I was getting at,
16     Mr. McKinney, is, if this thing does go to trial
17     at some point and you're making a claim for
18     wages, I'll need to know how that's calculated;
19     right? Do you know what you were earning prior
20     to your termination?
21 A   Well, if you're asking me, I know I'm not making
22     the same money I was making before I was forced
23     to retire.
24 Q   Do you have a problem with me getting your tax
25     returns so I can see what you were earning prior

Page 86

1  you had talked to the warden about, Batiste.
2  But, take a look and see if that's the same one
3  we were talking about before.
4  A  Yes. This is -- this is -- this is the letter.
5     I talked to Warden Batiste. And, if I'm not
6     mistaken, this is also the letter I think that
7     Major Hollingsworth got a copy of this letter,
8     also, I believe.
9  Q  All right. And, let's -- Okay. The second
10    paragraph it says, "Because of his neurological
11    status he probably needs to work in an
12    administrative setting with no loud noises." Do
13    you see that?
14 A  I do.
15 Q  Okay. Prior -- now, I'm talking about now.
16    This was November 27 of 2018. Prior to him
17    writing this letter, did you tell the doctor
18    that you had been shooting your gun?
19 A  I can't recall.
20 Q  Okay. What kind of gun did you have?
21 A  I had a Glock 22.
22 Q  Okay.
23 A  .40 cab.
24 Q  .40 Caliber?
25 A  Yes, sir.

Page 87

1  Q  What hearing protection were you hearing?
2  A  Standard earplugs.
3  Q  Standard earplugs?
4  A  Earmuffs, earmuffs.
5  Q  Earmuffs?
6  A  Yes.
7  Q  Ones that you owned or ones that the Sheriff's
8     Office supplied?
9  A  Ones that I owned.
10 Q  Okay. Let's go to the next one, which is No. 9.
11    Actually, before we do that, let me ask you
12    something. Let's go back to that No. 9. Did
13    you ask the doctor to write that letter for you,
14    the November 27, 2018 letter?
15 A  If I'm not mistaken, I had a -- I had an
16    appointment with the doctor and he asked for an
17    examination how was -- how was I progressing.
18 Q  Okay.
19 A  And I --
20 Q  Did you ask him --
21 A  I can't recall if I asked for a letter or not.
22 Q  Okay. All right. Let's go to November 29,
23    2018. This would be Exhibit No. 9. I don't
24    know if we talked about this one before or not,
25    but it appears to be a letter from Hollingsworth

Page 88

1     to you. Do you recall receiving this letter?
2  A  Oh, yes.
3  Q  Okay. How did you get the letter?
4  A  Major Hollingsworth came over to Warden
5     Batiste's office. That's the first time I had
6     met him.
7  Q  Okay. And, so did you have a conversation with
8     him?
9  A  He walked in and said who he was, and I told him
10    who I was by name, and -- and he presented me
11    with the letter.
12 Q  Okay. And, did you tell him anything? Did you
13    have any conversation with him, tell him that
14    you --
15 A  I -- I read -- I read the letter.
16 Q  Okay.
17 A  He asked me did I have any questions. And, of
18    course, being honest with you, I was very upset
19    that I had first met this person for the first
20    time and he's telling me to retire. I kept my
21    composure and said, "No, sir. I don't have any
22    questions." Because I know at the time, if I had
23    to say something, it wouldn't be my -- I
24    wouldn't -- I wouldn't -- I wouldn't feel like I
25    needed to say anything right there, so I didn't.

Page 89

1     I just said, "No, sir."
2  Q  All right. Let's go to No. 10. I don't think
3     we talked about this one yet, but it's a
4     December 5 letter. It looks like you wrote it
5     to Alma Perkins. Go back up to the top so we
6     can see it. Do you recall writing this letter?
7  A  Yes, sir. I -- I -- I sent that letter to the
8     human resource office, which was -- is
9     Ms. Perkins.
10 Q  Okay. Let's go through here. It says, "As a
11    person with a disability under the Americans
12    With Disability Act, I am requesting reasonable
13    accommodation to allow me to perform my job
14    duties. I am currently taking medication for my
15    disability and my doctor has placed me on
16    various restrictions." Do you see that?
17 A  Yes, I do.
18 Q  Okay. What was your disability under the
19    Americans With Disabilities Act in November of
20    2017?
21    MR. LANSER:
22        Objection, legal conclusion, but go
23        ahead, Mr. McKinney.
24 Q  Well, let me make it -- Let me rephrase that,
25    too, because I misspoke. What was your

Page 90

1   disability as of November of 2018?  So, a year
2   after your stroke what was your disability?
3   MR. LANSER:
4       Same objection, but go on.
5  A  I was -- I was -- I was still having problems
6   with weakness in my hand, probably carpal
7   tunnel.  I was still, as you have indicated here
8   today, I was still having problems with my
9   speech, and I was still having problems with the
10  noise level and sensitivity.  So, yes, that's
11  what I was dealing with in 2018 November, and
12  I'm dealing with that some today, also.
13 Q  But, let's go back to No. 8.  Well, let me check
14  real quick because when I look back at this
15  letter of November it says at the top, "He is
16  neurogically stable;" right?  Do you see that in
17  the first paragraph, third sentence?
18 A  Yes.  I can -- I can see that, neuro --
19  neurologically stable.  I can see that.
20 Q  Okay.  All right.
21 A  But, also he says -- it -- right -- right next
22  to it he says, "He continues on his medication."
23 Q  No, I understand.  I mean, the only thing I'm
24  seeing in this letter of November 27 is no loud
25  noises.  "Because of his neurological status he

Page 91

1   probably needs to work in administrative setting
2   with no loud noises."
3  A  Okay.  Are you also speaking --
4  Q  I'm trying to understand.  Maybe I just didn't
5   hear you correctly, and I'll -- Let me see if I
6   can understand.  In November of '18 I understand
7   that you couldn't be around loud noises and you
8   told me about speech, too.  But, I don't see
9   anything in the letter from your doctor saying
10  anything about speech.  Am I missing that or --
11 A  There's -- there's nothing in the -- in the
12  doctor's letter about speech.
13 Q  All right.  So, what -- going back to November
14  of '18, what were your disabilities then?
15 A  But, if you -- if you need me to get a letter
16  for my speech, I can do that also for your --
17  for your record.
18 Q  Yeah.  I'm going to talk to the doctor on
19  Wednesday, but I just wanted to know what you
20  recall.  In other words, go back to No. 10, I'm
21  sorry.  Going back to No. 10 it says, "As a
22  person with a disability under the Americans
23  With Disabilities Act.  So, you believe you had
24  a disability in November -- I'm sorry --
25  November of 2018.

Page 92

1  A  I don't believe I had a disability in November
2   of 2018, and I have a disability to this day
3   from my stroke. (sic)
4  Q  Right.  And, just to make sure I understand.
5   What major life activity did it prevent you from
6   doing?
7   MR. LANSER:
8       Objection as to legal conclusion.  Go
9   on, Mr. McKinney.
10 A  I could not qualify with my weapon for the
11  Rapides Parish Sheriff's Department, and I have
12  never missed qualifying in over 20-some years.
13  So, I had a medical condition -- that that
14  prohibited me from -- that prevented me from
15  qualifying with my weapon, and I had done so
16  every year through my employment.
17 Q  Okay.  Then it says, "I would like to change my
18  location and work schedule so that I can work
19  eight hours per day and not the 12 hours I am
20  currently assigned."  Do you see that?
21 A  Yes, sir.  I see that.
22 Q  Okay.  So, here's my question.  Why did you want
23  to change your location?
24 A  So I could work eight hours based on my medical
25  conditions.

Page 93

1  Q  But, I thought you said before that you were
2   working in the kitchen, and you were working
3   eight hours, and you were okay with that.  Why
4   did you want to change your location and work
5   schedule?
6  A  This -- this -- this -- I was asking for another
7   job if I can't keep the one I had.
8  Q  But, it doesn't -- in this letter it doesn't say
9   I'm currently working in the kitchen at eight
10  hours and I want to stay there; does it?
11 A  No, it doesn't.
12 Q  The only thing you asked for is to be
13  transferred to another location and a work
14  schedule with eight hours a day; right?
15 A  Yes.  That's -- that's what this is saying.
16 Q  All right.  And, that's the accommodation you
17  wanted?
18 A  That's the accommodation that I was asking for,
19  eight hours versus 12 hours based on my medical
20  condition.
21 Q  And changing location; right?
22 A  Yes, yes, changing location.
23 Q  All right.  Let's go to No. 11.  Do you remember
24  receiving this letter -- it looks like from
25  Sheriff Hilton.  Did you receive this document?

Page 106

1  Q   Okay.
2  A   To this day I'm still having the same problems.
3  Q   Okay.
4  A   And, I have seen my doctor. Just recently I saw
5      my doctor, and he knows my problem. But, I want
6      -- he can tell you when he talks to you
7      Wednesday what he has to say.
8  Q   Okay. That's fine. Let's go down later, right.
9      It says, the next paragraph, "Has been having
10     weakness in arms with numbness. I did a nerve
11     conduction study and EMG. This showed evidence
12     of mild cervical spondylosis and carpal tunnel
13     syndrome. For that reason, his hand
14     coordination is not good. He cannot do shooting
15     as a police officer. He is suppose to change
16     his position to watching the inmates." So, two
17     things. When he's saying he cannot do shooting
18     as a police officer -- well, next sentence,
19     "He's suppose to change his position to watching
20     inmates." Does that mean you thought you were
21     getting transferred in July 31 of '18 to
22     corrections? Is that what that means?
23     MR. LANSER:
24         Objection as to the speculation, but
25         continue, Mr. McKinney.

Page 107

1  A   I was -- I was -- I was told I was getting
2      transferred to corrections.
3  Q   Who told you that?
4  A   But, I say I wasn't. I was not. I was not told
5      in July I was being transferred to corrections.
6      All I was told I had to qualify or, if I didn't
7      qualify, I may be going back to the jail.
8  Q   Who told you that?
9  A   I was told that by -- by major -- at the time
10     Major Wood.
11 Q   Okay. So, at that time in July of '18 you knew
12     if you didn't qualify you were going to go back
13     to the jail; right?
14 A   I didn't know that for to be fact. That was the
15     rumor from -- rumor -- as they say rumor
16     control.
17 Q   I thought you said Wood told you that.
18 A   Yes, but rumor control I say, like a rumor
19     control. It wasn't concrete.
20 Q   So, if you look at the bottom it says, "If there
21     are a lot of noises, he probably cannot work in
22     these conditions. For that reason I will give
23     him an excuse to continue what he is doing now."
24     Do you see that?
25 A   Yeah, I see it. Yes, sir. I see it.

Page 108

1  Q   Did you tell the doctor that you were no longer
2      POST certified?
3  A   No, sir. I didn't. I haven't. I haven't
4      discussed with the doctor about anything dealing
5      with my shooting.
6  Q   Okay.
7  A   Anything.
8  Q   Okay. So, you didn't explain to the doctor
9      that, if he gives you an excuse to continue to
10     work as a bailiff that would be sending you to a
11     position that you were not even qualified to
12     work under because of POST. You didn't -- you
13     didn't explain that to the doctor.
14 A   Like I say, sir, I did not discuss anything as
15     far as my POST certification with my doctor.
16 Q   All right. So, then we talked about the letter
17     that we looked at before. There is a July 31
18     letter where -- that was written; right? Let's
19     do this. Let's go to the next one. Hang on.
20     Let's go to 18. Okay. Go to 19. The same day
21     we got this letter. You recall receiving this;
22     right?
23 A   Yes, sir.
24 Q   And, this is the same month that Wood had told
25     you, if you don't qualify, you might get

Page 109

1      transferred; right?
2  A   Yes, sir.
3  Q   Okay. And, you didn't give this letter to --
4      well, did you give this letter to anybody?
5  A   No, sir.
6  Q   Okay. And, correct me if I'm wrong, the reason
7      you didn't give that letter to anybody is
8      because you, in fact, weren't getting
9      transferred until much later?
10 A   I didn't -- I didn't give the letter to anyone,
11     sir.
12 Q   But, had you given this letter to the Sheriff's
13     Department, they would not have allowed you to
14     shoot your weapon; correct?
15     MR. LANSER:
16         Objection, speculation, but you can
17         answer.
18 A   I don't know if they would have allowed me or
19     not, sir.
20 Q   And, you also, yes or no, you didn't give this
21     letter to anybody because you, in fact, hadn't
22     been transferred yet?
23 A   I didn't give that letter to anyone, sir.
24 Q   All right. That's fine. Let's go to No. 20.
25     Do you recall getting a brain stem auditory voc

Page 114

1  December. I'm not sure what date.
2  Q  So, to get the letter did you have to go back up
3     there to get it, or did they mail it to you, or
4     how did that work?
5  A  I don't recall if they mailed it or we picked it
6     up. I don't -- I don't -- I'm not too sure, but
7     we got it, but I'm not sure --
8  Q  Did you think you got it -- Did you think you
9     got it by the November 30, '18 request date
10    that's in here?
11 A  I don't think so, but I -- I don't know for
12    sure.
13 Q  Okay. How did you get to that doctor to begin
14    with? In other words, you had your stroke in
15    November of '17. Had you seen that doctor
16    before November of '17?
17 A  That was -- that was my doctor when I had my
18    stroke.
19 Q  Right, no. I understand that. Your stroke was
20    November of 2017, but had you seen him before
21    November of 2017, or the first time you saw him
22    was because of your stroke?
23 A  The first time was because of my stroke.
24 Q  Okay. I understand. And, were you like
25    referred to him from the emergency room or

Page 115

1     something? Is that how that happened?
2  A  Yes. I was referred to him while I was in the
3     hospital.
4  Q  Okay. Got it. Let's go to No. 24 and see if
5     you've seen this before. Have you seen this
6     document before?
7  A  I have never seen this document.
8  Q  All right. Let me kind of read it, and I want
9     to go through and see if it's correct or not.
10    So, it's dated 5/7/19 that they wrote it, okay,
11    regarding expired firearms recertification. At
12    the top it says, "Note: To ensure an
13    understanding of the attached documents it
14    should be known that when an employee exceeds 13
15    months since the date of their last firearm
16    qualification one of the requirements from POST
17    is that they must shoot the course four times
18    consecutively and those scores be averaged." Is
19    that true, that first sentence I just read?
20 A  I'm not on the instructor side. I don't know if
21    it's true or not.
22 Q  Oh, well, let me ask you this. What we do agree
23    on is that, if you're 13 months without a
24    certification, you've got to get recertified.
25 A  Yes.

Page 116

1  Q  Okay. The next sentence says, "The combined
2     average score must be 96, which is 80% or
3     greater, up to 120, which is the maximum points
4     one can achieve on the mandated POST course."
5     Do you know whether that's true or not?
6  A  Yeah. The average score -- average score should
7     be 96.
8  Q  Okay.
9  A  Or higher.
10 Q  Okay. Let's go through the rest here. It says,
11    "This statement is to document the efforts of
12    both McKinney and RPSO trainers in his attempts
13    to qualify with his duty weapon for the year
14    2018. The last qualified firearm score recorded
15    for Mr. -- I'm sorry -- for McKinney is on
16    February 27, 2017." Do you agree with that,
17    that that was your last qualifying firearm
18    score?
19 A  Yes.
20 Q  On April 9, '18 he arrived for annual in-service
21    training. Do you remember that?
22 A  On April.
23 Q  Yes. On April 9, 2018 you went to qualify,
24    according to this.
25 A  I went to -- I went -- if I went in April, I

Page 117

1     went to practice.
2  Q  Okay. Maybe that's what it was.
3  A  Yeah.
4  Q  They call it annual in-service training. Maybe
5     we're just saying the same thing. Let's blow
6     this up a little bit for him, Wes.
7  A  I can see it.
8  Q  Okay. Never mind. He can see it. Okay. Do
9     you see that for annual in-service training, is
10    that, you believe it was practice?
11 A  I know it's -- I know to the best of my
12    knowledge it was practice.
13 Q  Okay. Then it says, "I could see --" and this
14    is it looks like it's Brooks who is signing --
15    who is doing this. Do you know who Brooks is?
16 A  No. That's -- that's -- that's a -- that's a
17    last name is Brown.
18 Q  Oh, Brown, I'm sorry. Do you know who Brown is?
19 A  Oh, yes.
20 Q  Okay. All right. It says, "I could see at that
21    time he was having difficulty with simple motor
22    skills such as walking, balance, comprehension,
23    and also appeared to be generally fatigued. I
24    separated him from other employees which were
25    present and asked if he was okay." Do you

Page 130

1  looking at is we've got maybe six or seven
2  visits.  Look, if I'm wrong, tell me I'm wrong.
3  I'm just trying to do math here.  I'm saying
4  three times that we went to qualify, and say
5  three or four times that you went to go, you
6  know, practice.  When you -- when you go to
7  qualify and you shoot 60 x 4, 240.  When you
8  visit and you're just practicing, how many
9  rounds do you shoot if you're just practicing?
10 A  You -- you -- you -- you can shoot 60 and leave
11    the range.
12 Q  Okay.
13 A  Or you can shoot until the instructor says,
14    well, I'm going to close down for the day.
15 Q  What did you normally do at this time, you know,
16    after your stroke?  I mean, how many rounds were
17    you shooting at practice?
18 A  I made sure I tried to shoot 60 and I was -- my
19    hand was getting -- was still weak, so I
20    couldn't do no more.
21 Q  So, just about 60?
22 A  And every -- and everybody know -- well, the
23    range person there knew from my stroke.  On that
24    second try my hand was getting weak.  Even --
25    even the sheriff knows that, so.

Page 131

1  Q  So, I guess --
2  A  -- (inaudible) --
3  Q  Go ahead.  I'm sorry.  I did not mean to
4     interrupt you.
5  A  So, I did the best I could to qualify.  But,
6     with the situation, I wasn't able to, and I'm
7     not --
8  Q  All right.  I gotcha'.
9  A  I'm not -- I'm not ashamed.  I did the best I
10    could.
11 Q  I understand.  All I was trying to figure out,
12    when I'm doing my math in my head, because I
13    know he just wrote the 1,900.  But, I'm trying
14    to figure out what other number that might have
15    been, because when I calculate it, it looks like
16    it's more than 600, because this is what I did.
17    I did three qualifying times at 240 of
18    qualifying; right?  So, 240 rounds for each
19    qualifying event, times that you went to
20    qualify.  So, 240 x 3 is 720.  And, if you did
21    three visits or so, or three to four visits for
22    practice, that's 60 rounds a visit, that's about
23    240.  That still takes me close to about 1,000
24    rounds.  So, I guess that's kind of the number I
25    was looking at.  Am I doing that math wrong?

Page 132

1  A  Well, if you're -- if you're going for
2     qualification, you are allowed to shoot -- you
3     -- you -- you are -- we are allowed to shoot
4     four times.
5  Q  Right.
6  A  And, we are issued 60 rounds.
7  Q  Okay.  Right.  So, that's 240 shots.  That's 240
8     rounds each qualifying attempt.
9  A  Yes, sir.
10 Q  Okay.  So, we did three of those, so that's 720.
11    Do you agree with me there?
12 A  Yes, sir.
13 Q  All right.  And, then you went three to four
14    times on your own where you shot about 60
15    rounds.  So, that's about another 200 or so.
16 A  And, I also had my own ammo.
17 Q  Right, I understand.  I'm just saying the
18    numbers of rounds shot is probably around 1,000
19    if I use those numbers, not 1,900.
20 A  It's not 1,900, I know for a fact.
21 Q  1,000 is fair?
22 A  I would say that's -- that's -- that's fair.
23 Q  Okay.  I don't think I have anymore questions.
24    Dave, do you have any questions?  Actually, no.
25    I do have one more.  Hang on.  I need to ask him

Page 133

1     this.  Did you do any -- since your stroke have
2     you done any details?
3  A  No, sir.  I -- I -- I've -- I'm retired from the
4     department.  I can't work any -- I don't know
5     any -- any details.
6  Q  I may have had a bad question.  I guess what I
7     was getting at, from February of '18, okay, when
8     you came back after your stroke until you were
9     fired, did you work any details during that
10    period of time?
11 A  I wasn't -- I wasn't -- I wasn't able to work
12    any details due to my medical -- medical
13    condition.  I don't -- I don't -- I don't recall
14    working any details.
15 Q  I'm trying to get that from the Sheriff's Office
16    to see, but I thought that they may have
17    indicated that you had done some detail maybe at
18    an airport or something.  Does that ring a bell
19    at all?
20 A  I -- I -- I worked at, uh -- I worked the
21    airport some weekends, but I don't recall
22    working the airport after my stroke.  I may
23    have.  I don't recall.
24 Q  Do you have to be POST certified to work a
25    detail?

### Page 134

1  A    Well, if -- I was -- I would say yes and no.
2       And, why I say yes and no because -- Well, I'm
3       going to say yes and no.  I'm going to leave it
4       at that.
5  Q    Well, I don't know what that means.
6  A    I will -- I will -- I'm going to consult my
7       attorney.
8  Q    You refuse to answer that question?  I just said
9       if you don't answer it --
10 A    Excuse me, sir?
11      MR. LANSER:
12          I think he's just -- he's just -- you're
13      asking him whether it's required to have POST
14      certification?
15      MR. RICHARDSON:
16          Yeah.  I want to know do you have to be
17      POST certified to work a detail.
18 A    Yes, yes, yes.  It is.  It is required to work
19      POST -- It is required, to work a detail, you
20      must be POST certified, yes, but -- but also --
21 Q    So, what I'm trying to get at, and I'm going to
22      get the records, and I'll get them today as soon
23      as I can get them; but, were you working details
24      after March of 2018?
25 A    I can't recall if I worked a detail after March

### Page 135

1       of 2018.
2  Q    Okay.  What we'll do.  I'll get these and I'll
3       get them today and we'll send you a little
4       request and ask you if they're accurate if we
5       get those, and then you can determine if you
6       were or weren't; okay?
7  A    Sounds good, sir.
8  Q    All right.  I don't have any further questions.
9  EXAMINATION BY MR. LANSER:
10 Q    Okay.  I think I just have a couple of brief
11      ones here.  Let's see.  Okay.  Mr. McKinney, so
12      as of December of 2018 you are still actively
13      attempting to qualify for POST certification; is
14      that correct?
15 A    What day, sir?
16 Q    As of December 2018 when you were terminated,
17      you were still trying to qualify?
18 A    Yes, sir.
19 Q    Okay.  Did you ever receive any, you know,
20      additional support or training from Rapides
21      Parish Sheriff's Office in your attempts to
22      requalify?
23 A    No, sir.  I never received any support.  And, if
24      I can add, the only support I received was from
25      one of my coworkers.

### Page 136

1  Q    Okay.
2  A    That's the only support.
3  Q    Wes, if you don't mind, can you pull up
4       Exhibit 13 real quick?  I think it was 13.
5       That's fine right there.  Do you remember this,
6       uh -- this letter we talked about earlier,
7       Mr. McKinney?  Do you remember this letter?
8  A    Yes, sir.
9  Q    Okay.  And, if I'm reading this correctly, it
10      says in this first paragraph here it says, "We
11      informed you in our letter dated December 10th,
12      2018 you do not meet POST requirements."  Do you
13      see that?  Does that sound correct?
14 A    Yes, sir.  I see it.
15 Q    Okay.  So, as of December 10th, 2018 you were
16      still actively attempting to recertify?
17 A    Yes, sir.
18 Q    Okay.  Give me one minute here.  Let me look
19      over my notes one second.  At any point after
20      you returned to work following your stroke at
21      any point did you have a conversation with the
22      sheriff about potential positions you could have
23      been transferred to?
24 A    No, sir.
25 Q    Okay.  Was there any conversation about, you

### Page 137

1       know, other than what we've seen in the letters,
2       did the sheriff ever speak to you about specific
3       accommodations that he might be able to provide
4       you?
5  A    He never spoke to me at all about any positions.
6  Q    Okay.  How about anyone else, like Doug
7       Hollingsworth or anyone else?
8  A    No.  No one else -- no one else ever spoke to me
9       about any potential positions that they can
10      transfer me to.
11 Q    Okay.  So, in November 2018 you did work some
12      12-hour shifts in the control center; is that
13      correct?
14 A    That is correct.
15 Q    But, you don't recall the exact dates?
16 A    I don't recall the exact dates.
17 Q    You also mentioned, when you were discussing
18      your hypersensitivity to noise you mentioned,
19      you know, something -- something like the TV
20      being on too loud or your grandkids playing a
21      video game or something like that as -- as
22      things that can potentially trigger that.  Is
23      that correct?
24 A    That is correct, sir.
25 Q    Okay.  Is there -- is there a difference in the

Page 138

```
 1      noise level and how it affects you versus one of
 2      those examples like a television being on
 3      versus, you know, offenders in the jail making
 4      noise?  Is there a difference there?
 5   A  I would say -- I would say no, sir.  There is no
 6      difference.  It still -- it still affects me.
 7   Q  Okay.  It doesn't affect you more when it's
 8      louder?
 9   A  It -- it -- it affects me when it's louder
10      versus when it's lower.  So louder --
11   Q  So, if it's louder noise, it might affect you
12      more seriously than if it's a quieter noise?
13   A  Yes, sir, it does.
14   Q  Okay.  Did you -- did you want to retire in
15      December of 2018?
16   A  No, sir.  I didn't want to retire.
17   Q  Would you have continued to work at Rapides
18      Parish Sheriff's Office, assuming you could do
19      it safely?
20   A  Yes, sir, I would have.
21   Q  Okay.  I don't think I have any further
22      questions.
23      MR. RICHARDSON:
24            All right.  That's it.  Mr. McKinney,
25      you have an option to read and sign the
```

Page 139

```
 1      deposition.  We videoed it, as well, but
 2      that's up to you.  If you want her to send it
 3      to you, you can read it and sign off on it,
 4      or you can waive that right, and she'll go
 5      ahead and just type it up.
 6      MR. LANSER:
 7            I think she can just type it up.
 8      MR. RICHARDSON:
 9            Yeah, type it up.  Okay.  That's fine.
10      All right.  We'll do that.  Thank you, sir.
11      Mr. McKinney, I wish you the best of luck.
12      Dave, I will see if I can find anything on
13      details, hopefully before tomorrow's
14      deposition -- I mean Wednesday -- assuming
15      we're not all under water here, and I will
16      send it to you.
17      MR. LANSER:
18            All right.
19      MR. RICHARDSON:
20            All right.  Thanks everyone.
21   (Deposition is concluded at 1:20 p.m)
22
23
24
25
```

Page 140

```
 1                    CERTIFICATE
 2
 3      This certification is valid only for a
 transcript accompanied by my original signature and
 4  original required stamp on this page.
 5      I, Cyndie L. McManus, Certified Court Reporter
 in and for the State of Louisiana, as the officer
 6  before whom this testimony was taken, do hereby
 certify that, Jerry McKinney, after having been duly
 7  sworn by me upon authority of R.S. 37:2554, did
 testify as hereinbefore set forth in the foregoing
 8  139 pages; that this testimony was reported by me in
 the stenotype reporting method, was prepared and
 9  transcribed by me, and is a true and correct
 transcript to the best of my ability and
10  understanding; that the transcript has been prepared
 in compliance with transcript format guidelines
11  required by statute or by rules of the Board; that I
 have acted in compliance with the prohibition on
12  contractual relationships as defined by Louisiana
 Code of Civil Procedure Article 1434 and in rules and
13  advisory opinions of the Board; that I am not related
 to counsel or to the parties herein, nor am I
14  otherwise interested in the outcome of this matter.
15      In witness whereof, I have hereto affixed my
 signature and certification stamp on this 16th day
16  of September, 2020.
17
18
19                    _____
20
                      Cyndie L. McManus
21                    Certified Court Reporter
                      State of LA #91137
22
23
24
25
```