UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA


JERRY MCKINNEY, SR.,

    Plaintiff

V.                              Civil Action 1:19-CV-01339

RAPIDES PARISH SHERIFF'S OFFICE
and SHERIFF WILLIAM EARL HILTON,

    Defendants


    30(b)(6)DEPOSITION OF RAPIDES PARISH SHERIFF'S OFFICE, through its designated representatives, STACY McCAIN, SHERIFF WILLIAM EARL HILTON, DEBBIE McBETH, given via videoconferencing in the above-entitled cause, pursuant to the following stipulation, before Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, commencing at 9:15 o'clock a.m., Tuesday, the 14th day of July, 2020.



EXHIBIT
I

SOUTHERN COURT REPORTERS, INC.
(504) 488-1112

| | |
|---|---|
| 1 | November of 2017, Jerry McKinney had a |
| 2 | stroke, correct? |
| 3 | A. Yes. |
| 4 | Q. And so he went out on medical leave through |
| 5 | February of 2018.  Is that correct? |
| 6 | A. I'm assuming that's correct.  I don't have |
| 7 | the dates with me on -- |
| 8 | Q. Okay, but he went out on medical leave for |
| 9 | a while and then came back to work, |
| 10 | correct? |
| 11 | A. Yes. |
| 12 | Q. And then in the fall of -- of 2018, Mr. |
| 13 | McKinney failed his -- his firearm |
| 14 | certification process, correct? |
| 15 | A. Correct. |
| 16 | Q. Because he was impaired from the stroke he |
| 17 | had had the year before? |
| 18 | A. Yes. |
| 19 |        MR. RICHARDSON: |
| 20 |        Object to the form. |
| 21 |        You can answer. |
| 22 | BY MR. MOST: |
| 23 | Q. Okay.  The answer was yes? |
| 24 | A. Yes. |
| 25 | Q. Yeah, and so he was transferred from the |

```
 1        Courtroom Security to Corrections.  Is that
 2        correct?
 3   A.   Correct, yes.
 4   Q.   And -- and in Corrections it's not required
 5        that the deputy be firearm certified and
 6        carry a gun.  Is that correct?
 7   A.   Correct, yes.
 8   Q.   And that's why you transferred him over to
 9        Corrections, correct?
10   A.   Yes.
11   Q.   And the Courtroom Security is -- is more
12        like a normal workday; it's about eight
13        hours, but working Corrections is a 12-hour
14        shift, correct?
15   A.   Yes.
16   Q.   And when we talk about Corrections, do we
17        mean the jail?
18   A.   Yes, yes.
19   Q.   Okay, and Warden Batiste was the Warden of
20        the jail at the time?
21   A.   DC-3, yes.
22   Q.   What is DC-3?
23   A.   We have three detention centers here.  We
24        have DC-1 where all people are booked that
25        are arrested.  We have DC-2, which is a
```

```
 1         trustee work-release type program.  DC-3 is
 2         a facility where we detain inmates that are
 3         doing time.
 4   Q.    Okay.  Doing parish time?
 5   A.    Parish and State.
 6   Q.    Okay, and Warden Batiste in late 2018 was
 7         the Warden of the DC-3 facility, correct?
 8   A.    Yes.
 9   Q.    He was the person, the highest person at
10         that facility?
11   A.    Yes.
12   Q.    He was responsible for the day-to-day
13         management of that facility?
14   A.    Yes.
15   Q.    And why is Corrections a 12-hour shift?
16   A.    Well, a lot of police agencies, a lot of
17         correction facilities all over the country,
18         they just like the 12-hour shifts.  It
19         gives the employee a little time off.  It's
20         a lot of hours on the front end, but he
21         gets a lot of time off on the back end, and
22         employees like that.  State Police do it on
23         patrol.  We do it.  Most of your police
24         departments work 12-hour shifts.  The way
25         it works out, it's basically you work 16
```

```
 1        days one month and 14 another month.  So
 2        it's good for the employee.
 3    Q.  Okay.  So it -- the 12-hour shift is the
 4        way the Sheriff's Office does Corrections
 5        because that's for the convenience and
 6        benefit of the employee?
 7    A.  This -- this is nationwide.  Most agencies
 8        do that.
 9    Q.  Okay, and -- and the reason why is it's for
10        the convenience and benefit of the
11        employees?
12                MR. RICHARDSON:
13                Object to the form.
14   BY MR. MOST:
15    Q.  What was your answer, Sheriff?
16    A.  Yes.
17    Q.  Okay.  So it's not something inherent to
18        the job, like, I don't know, like, you have
19        to get flown somewhere, and the flights
20        only go every 12 hours or something.  It's
21        -- it's for administrative convenience and
22        the benefit of the employee, but it's not
23        something integral to the nature of
24        corrections.  Is that correct?
25                MR. RICHARDSON:
```

```
 1        answer those, hey, I'm good with it.
 2            THE WITNESS:
 3            What number are we -- what number
 4        are we talking about?
 5            MR. RICHARDSON:
 6            We're talking about 4 and 16.
 7            MR. MOST:
 8            Yeah.  So 4 -- 4 is the process
 9        of searching for whether there are
10        any positions Mr. McKinney can do,
11        and 16 is about the interactive
12        process of seeking accommodation so
13        --
14            THE WITNESS:
15            No. -- No. 4 is simply the fact
16        of looking at the roster and seeing
17        where there were any openings, and
18        we did that, and there were no other
19        positions open that McKinney could
20        be placed in.  So, you know, that
21        was obvious that that couldn't
22        happen.  16, "Any interactive
23        process of seeking accommodations
24        that any Defendant engaged in with
25        Dep. McKinney," basically, that's
```

```
 1              the same answer.
 2   BY MR. MOST:
 3   Q.   Okay, and who would be best to answer that,
 4        you or Debbie, those two topics?
 5   A.   Probably Major Hollingsworth or Debbie, but
 6        Hollingsworth and Debbie both, you know,
 7        they're going to give you the same answer,
 8        because that's just how it is.  That's --
 9        that's all we had.
10   Q.   Yeah.  I want to go through the roster.  So
11        I'll go through that with -- with Debbie.
12                MR. MOST:
13                Unless you object, Tim, I'll --
14             we'll just merge 4 and 16.
15                MR. RICHARDSON:
16                No problem.  That's -- that's
17             good.
18   BY MR. MOST:
19   Q.   Okay.  So moving on to Topic No. 5, which
20        is, "The reasons why Deputy McKinney was
21        terminated" --
22                MR. RICHARDSON:
23                I think he answered that already.
24                MR. MOST:
25                Yeah, but we'll go into it in a
```

|   |   |   |
|---|---|---|
| 1 |    | had to do something.  It was -- you know, |
| 2 |    | the clock was running, and Jerry wasn't |
| 3 |    | getting any better, and we just -- you |
| 4 |    | know, we had to do something, and so we |
| 5 |    | fired him. |
| 6 | Q. | And why couldn't you just let him keep |
| 7 |    | working eight-hour shifts at the prison? |
| 8 | A. | Because those are not eight-hour shifts. |
| 9 |    | They're 12-hour shifts, and if we let one |
| 10 |    | employee take advantage of eight-hour |
| 11 |    | shifts, tomorrow and the next day and the |
| 12 |    | next week, there are going to be other |
| 13 |    | employees there wanting to work eight |
| 14 |    | hours, and you can't disrupt a facility |
| 15 |    | like that with letting some work eight |
| 16 |    | hours and some 12.  It's like being in the |
| 17 |    | military.  It's a ritual.  You do |
| 18 |    | everything on time.  You do it exactly the |
| 19 |    | same every day, and we couldn't make an |
| 20 |    | extension -- exception for Jerry. |
| 21 | Q. | Because you didn't want him to get special |
| 22 |    | treatment that other people might want? |
| 23 | A. | No, it's not good for him; it's not good |
| 24 |    | for the department. |
| 25 | Q. | Right.  So it would have been I guess |

```
1        You could have other inmates hurt.  You
2        could have employees hurt, and so it's --
3        like I stated way back earlier in the day,
4        it's kind of like military.  It's
5        regimented.  You do certain things at
6        certain times.  Everybody does it the same
7        on every shift, and they keep everything
8        working and functioning as it should be.
9   Q.   All right, and some of things you mentioned
10       in there, and I know I think you're looking
11       at some documents maybe that we produced --
12  A.   Yes.
13  Q.   -- you know, that we gave Mr. Most in that
14       thousand, couple of thousand-page
15       production, but you talk about logs.  So
16       you have to keep logs of what goes on
17       during the jail for each inmate and -- and
18       the basic functions of the jail that
19       happens each shift, correct?
20  A.   That's correct.
21  Q.   And when you've got another shift change
22       that comes in, right, and that happens, and
23       you're moving one group out to another
24       group, right, does that create some -- I
25       guess for lack of a better term, some
```

```
 1        downtime where you actually have to swap
 2        people out?
 3   A.   When the relief shift --
 4   Q.   To get them up to speed in other words?
 5   A.   When the relief shift comes in, they are
 6        briefed --
 7                  THE COURT REPORTER:
 8                  Wait, wait.  Repeat.
 9   BY MR. RICHARDSON:
10   Q.   Couldn't hear you, Sheriff.
11   A.   Okay.  The incoming shift comes in, reports
12        for duty, and they are briefed by the
13        outgoing, the shift that's coming off duty,
14        and that's -- that's a smooth transition.
15        After you do it for some time, a few days,
16        you know, everybody knows what he's doing;
17        he knows where his work station is; he
18        knows what to do in his zone, and he goes
19        there and does that, and if there's
20        anything that the zone officer there from
21        the prior shift needs to tell him, he tells
22        him that, and the off-duty shift leaving
23        out, they leave, and it becomes the
24        responsibility of the incoming shift to
25        carry on.
```

```
 1   Q.   Right.  So when that new shift comes in,
 2        the old shift has to relay all the
 3        information to the new shift, and then they
 4        take over from there, correct?
 5   A.   They take over from there, and anything of
 6        any significance is written down, and
 7        there's a permanent record of it, because,
 8        you know, when a situation occurs, and
 9        things do happen in -- in jails, and you
10        get into litigation and criminal charges
11        and things like that, you have to be
12        documented.
13   Q.   I understand.  And when you only have one
14        shift change, in other words 12 hours and
15        12 hours, you have less of that relaying
16        information to the next shift than you
17        would have to do if you had three
18        eight-hour shifts, right?
19   A.   Absolutely, and I've worked eight-hour
20        shifts and the -- the 12-hour shifts, is --
21        that's the way everybody wants to do it,
22        and that's the way to do it.
23   Q.   And that's the way you did it in your jail
24        and still -- is still done in the jail?
25   A.   Yes, it has been -- it has been done like
```

```
 1        that here for since approximately 1984.
 2   Q.   All right.  So let's talk about the letter
 3        that we looked at before, that November
 4        2018 letter.  You remember that letter that
 5        you looked at for Mr. Most talking about
 6        Mr. McKinney.  It was a note from the
 7        doctor.
 8                 MR. MOST:
 9                 I think it's November 27.  You
10            want me to pull it up?
11                 MR. RICHARDSON:
12                 November 27.
13   BY MR. RICHARDSON:
14   Q.   Do you have it, Sheriff?  William might
15        have it.  There you go.
16                 MR. MOST:
17                 Yeah, I can pull it up.
18                 MR. RICHARDSON:
19                 All right.  You see that.  What
20            number is that, William, on our --
21            on our list?
22                 MR. MOST:
23                 It's "Exhibit 15."
24                 MR. RICHARDSON:
25                 15.
```

# CERTIFICATE

THIS CERTIFICATION IS VALID ONLY FOR A TRANSCRIPT ACCOMPANIED BY MY ORIGINAL SIGNATURE AND ORIGINAL REQUIRED SEAL ON THIS PAGE.

I, RAYNEL E. SCHULE, Certified Court Reporter, #77005, in good standing, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that STACY McCAIN, SHERIFF WILLIAM EARL HILTON, and DEBBIE McBETH, after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 198 pages; that this testimony was reported by me in stenotype reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding; that the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the Board, that I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the Board; that I am not of counsel, not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

_____    _____
Date                    Raynel E. Schule, CSR
                        Certified Shorthand Reporter
                        State of Louisiana